(PRIZE.)

## The MARY.

Where an enemy's vessel was captured by a private armed vessel of the United States, and subsequently dispossessed by the force or terror of another; the prize was, under the circumstances of the case, adjudged to the first captor, with costs and damages.

APPEAL from the circuit court for the district of Massachusetts.

The British schooner Mary, whereof Charles Thomas, jr. a British subject, domiciled at St. Johns, New Brunswick, was late owner and master, sailed under convoy from St. Johns, New Brunswick, bound to Castine, then in the military occupation of the British, laden with a cargo, the growth, produce, and manufacture of British possessions, shipped by British merchants domiciled in St. Johns, N. B. to merchants resident in Castine.

The schooner Mary was captured by the private armed schooner *Cadet*, between Duck Island and Mount Desert, on the night of the 25th of December, 1814, between the hours of 11 and 12; the convoy under which the Mary sailed, was in sight of the Mary at the time of her capture; but no other vessel was in sight at that time. The *Cadet* came up with the Mary so suddenly, that she had no opportunity to make resistance, or give notice to the convoy of her danger.

After the capture of the Mary, the principal part

of her cargo was taken on board the *Cadet*, carried into the district of Massachusetts, and, in the district court of said district, condemned to the *Cadet* as prize of war.

On the morning of the 25th of December, after sun-rise, the *Cadet* and Mary being then in company, an armed brig, the *Paul Jones*, was discovered by them, under such suspicious circumstances, as to induce them to believe her to be a British cruiser, and, in consequence, to part, and steer different courses. The sails of the *Paul Jones* were of English canvass. She pursued the Mary, firing at her, until between 4 and 5 o'clock, P. M. of the 26th of December; the Mary had then arrived in a bay of the United States, to wit, Wheeler's bay, a bay frequented by American vessels. The Mary being within half a mile of the shore, and within the same distance of the *Paul Jones*, and being in such a situation as rendered it certain that she must be intercepted by the *Paul Jones*, the prize master and crew, considering it certain, from her appearance and actions, that the *Paul Jones* was an English cruiser, left the Mary for the shore, after having thrown over her anchor, and ordered the British captain, and his son of twelve years of age, who were left on board, to pay away the cable.

After the prize crew left the Mary, the British master hoisted English colours, and steered the schooner towards the *Paul Jones*.

Ten minutes after the prize crew left the Mary, she was boarded by a boat from the *Paul Jones*, when the English captain informed them that the

Mary was an English vessel, prize to the *Cadet*, when the *Paul Jones* immediately stood off from the land with the Mary in company, with English colours still flying.

A boat, then out to the windward of the Mary, and within musket shot, or a quarter of a mile distant from her, (the crew then lying on their oars, the sea smooth, and the wind light,) repeatedly hailed the Mary, both before and after she was boarded by the *Paul Jones*, and received no answer.

The prize master of the Mary, immediately on his getting on shore, despatched a boat on board her to ascertain the national character of the vessel by whom she was boarded, and claim her if the boarding vessel should prove American; but, before the boat could get off, the *Paul Jones* had sailed with the Mary in company.

Libels against the Mary and cargo were filed in the district court for the district of Maine, by David Elwell, in behalf of himself, and the owners, officers, and crew, of the private armed schooner *Cadet*, and by John Thomson Hilton, in behalf of himself, and the owners, officers, and crew, of the private armed brigantine *Paul Jones*. The Mary and cargo were condemned in the district court for the district of Maine, to John Thomson Hilton, and the owners, officers, and crew, of the *Paul Jones*. An appeal was entered from said decree by David Elwell, and the owners, officers, and crew, of the *Cadet*, in the circuit court of Massachusetts. In consequence of the affinity of the judges to the parties, the decree of the district court of Maine was,

by consent of parties, affirmed *pro forma*, and the cause brought, by appeal, to this court.

Feb. 12th.   Mr. *Jones*, for the appellants. This is a case of novel impression as to the circumstances, but long since settled in principle. The prize crew of the *Cadet* were driven out of the Mary by the terror or the force of the *Paul Jones*. It is not the case of a prize abandoned and taken as *res nullius*, nor retaken by the original British crew, and recaptured by the Paul Jones. The prize was in a place of safety, *infra præsidia ;* not constructively, as of a fleet, or a neutral port, but of a port of the captor's country. In order to constitute a dereliction of the property acquired in the thing captured, the abandonment must be voluntary, and with intent to relinquish the right acquired. The origin of this principle is to be found in the Roman code, which distinguishes between a *voluntary* and *compulsory* abandonment of possession; the first changing the right of property, whilst the latter has no such effect.[a] It is applied to

a *Just. Inst. L. 2. t.* 1, *sec.* 46. 47. Alia sane causa est earum rerum, quæ in tempestate levandæ navis causa ejiciuntur. Hæ enim dominorum permanent: quia palam est, eas non eo animo ejici, quod quis eas habere nolit, sed quo magis cum ipsa navi maris periculum effugiat. Qua de causa, si quis eas fluctibus expulsas, vel etiam in ipso mari nactus, lucrandi animo abstulerit, furtum committit. So also *D'Habreu*, in commenting on the 9th article of the French prize ordinance, (which prescribes that, if a captured vessel, not having been recaptured, is abandoned by the enemy, or if by storms or other accidents, it returns into the possession of French subjects, before having been carried into any enemy's port, it shall be restored to the former owner, if claimed within a year and a day, although the possession of the enemy may have continued more than

the law of prize by the different elementary writers.[b]
It was practically enforced in the case of the Lord
Nelson,[c] and by this court in the case of the Mary
Ford.[d] Striking the colours is to be deemed the
real *deditio*, and the consummation of the capture.[e]
So, also, the capture is held to be consummated
where the prize is completely under the dominion of
the captor, has no ability to resist, and no prospect
of escape.[f] Here was no recapture by the enemy

twenty-four hours,) makes the following observation, "Quoique l'article de l'ordonnance ne paroisse pas faire la différence en...un vaisseau abandonné par les ennemis, et celui qui l'a été par l'effet d'une tempête ou de quelque autre accident imprévu ; il est néanmoins certain qu'il y en à quelqu'une. Nous n'entreprendrons point ici de la faire sentir : outre que cela nous écarterait de notre objet, il n'est personne, tant soit peu versé dans la jurisprudence, qui ignore que l'abandon volontaire fait perdre la propriété, tout au contraire de celui qui est forcée." *D'Habreu on Prizes*, ch. 5. §10. tom. 2. p. 95. of M. Bonnemant's Translation.

b *Bynkershoek, Q. J. Pub.* ch. 4. p. 35 of Du Ponceau's Translation, *Id.* ch. 5. p. 36. 2 *Azuni*, Part 2. ch. 4 art. 2. § 1. 3. 7. 2 *Woodeson*, 454. See also 2 *Burr.* 693. Goss *et al.* v. Withers. In that, case the true distinction on

this subject is alluded to by Lord Mansfield, that by whatever length of time, or other circumstance the property in prizes is vested, so as to bar the former owner in case of recapture or sale, "the instant the captor has got *possession*, no friend, no fellow-soldier, or ally, can take it from him ; because it would be a *violation of his property.*" And it is in this sense must be understood what is repeated by so many writers from the civil law, *Quæ ex hostibus capiuntur,* STATIM *capientium fiunt.* An inchoate title immediately accrues as against any cruiser of the same nation or its allies in the war, which title cannot be devested but by a *voluntary* abandonment on the part of the first captor. 2 *Woodeson*, 455.

c *Edwards*, 79.

d 3 *Dall.* 198.

e 1 *Rob.* 195. The Rebeckah.

f 3 *Rob.* 246. The Edward and Mary.

crew, because no resistance nor escape; and the British master could clearly not have maintained a claim for salvage in the courts of his own country had the Paul Jones turned out to be a British privateer.

Mr. *Webster*, contra.   This is a case of voluntary relinquishment of the prize; and even if it was produced by terror of a supposed enemy, that will not make it *involuntary*.   The case of the Lord Nelson does not determine the present case; but Sir William Scott there puts the very case now before the court, and decides it by asking, " Suppose, therefore, that after this voluntary abandonment, the ship had been met with by some French cruiser, and that by means of jury-masts, they had succeeded in carrying her into a French port; can there be any doubt that she would have been prize to the second captor?"   In the case of the Ann, which was a question of jurisdiction in a revenue cause, the seizure being abandoned before adjudication, this court illustrate their opinion by analogy to the prize law, holding, that capture gives no authority to proceed to adjudication, if abandoned before judicial proceedings are commenced.[g]   So, also, in the case of the Astrea, it was determined, that an interest acquired by possession is devested by the loss of possession, from the very nature of a title acquired in war.[h]   The case of the Adventure is likewise in point.[i]   There was no fraud on the part of the Paul Jones.   She had a right to chase under any colours;

g  9 *Cranch*, 289.       h  1 *Wheat.* 125.       i  *Ib.* note (f.)

1817.

The Mary.

but she neither chased nor fired under enemy's colours: whilst the prize showed no colours, and therefore invited pursuit; and was found in the possession of her original British master, and therefore authorized detention. She was not *infra præsidia* whilst lying in Wheeler's Bay; but even supposing she had been, if she was afterwards abandoned by her original captor, the Paul Jones had a right to take possession. The prize master did not think it worth while to risk being taken prisoner, and therefore abandoned his prize.

Mr. *Jones* in reply. The case supposed by Sir William Scott, in delivering his judgment in the Lord Nelson, is of a voluntary abandonment, and not one produced by the application of force or terror. In the case of the Ann, this court, though *incidentally* describing the general doctrine, adhere to their accustomed accuracy and precision of language. " A *voluntary* abandonment" is the phrase used by the learned judge, who delivered the opinion of the court; and he proceeds to state, " It is not meant to assert that a tortious ouster of possession, or fraudulent rescue or relinquishment after seizure, will devest the jurisdiction." The precedent of the Astrea does not apply. In that case there was a capture and recapture, and a second recapture; but no question whether the abandonment by the first captors was voluntary or not. The case of the Adventure was not a question of derelict; but whether the belligerant may invest a neutral with his rights at sea, in fraud of the contingent right of recapture by the

1817.     other belligerent.   The question here is not whether
The Mary. *fraud* was used, but whether *force* was used.   The
prize crew supposed they were surrendering to Bri-
tish captors : but the Mary was not in a situation to
be captured by a cruiser of the United States; she
was not derelict, but lying in a roadstead, which is a
*præsidium*, though not guarded by forts and castles.

Feb. 14th.      Mr. Justice JOHNSON delivered the opinion of the
court.

We are of opinion that the facts stated, in this
appeal, make a clear case of tortious dispossession
on the part of the Paul Jones.   The privateer Ca-
det had, with great gallantry, captured the Mary,
and been in possession of her part of a night and
day.   The prize was close in upon the American
coast, and making for a port which was open be-
fore her.   It was not until the superior sailing of
the Paul Jones made it manifest that the prize must
be cut off from this port, and until she had been re-
peatedly fired upon, that the prize crew abandoned
her.   There exists not a pretext in the case that
this abandonment was voluntary, or would have ta-
ken place but for the hostile approach of the Paul
Jones.   Whether the *vis major* acted upon the
force or the fears of the prize crew is immaterial,
since actual dispossession ensued.

But it is argued that the Paul Jones showed
American colours; the Mary ought not therefore to
have feared her : the Mary showed no colours, she,
therefore, invited pursuit; and, finally, that the Paul
Jones found her in the actual possession of her

original master, and, therefore, could not have done otherwise than detain her.

We think otherwise. It was more probable that an enemy would show *false* than *true* colours. The circumstance of the Mary standing in for a friendly shore, was less equivocal evidence of her character than the exhibition of colours; and, after boarding the Mary, and learning that she was a prize to the Cadet, it was the duty of the captor to have repaired the injury he had done, and, either by making signals, sending a boat on shore, or a message by the boat that did come off, to have recalled the prize crew of the Cadet. But, instead of this, she instantly mans the prize, bears away from the harbour, which was close under their lee, and, by carrying English colours until out of sight, completes the conviction of the prize crew that the re-capture was by an enemy.

We are of opinion that the decision of the circuit and district courts should be reversed; that the prize should be adjudged to the Cadet; and the case remanded for the assessment of reasonable damages in favour of the Cadet. But, considering that the prize arrived in safety, and probably in a more secure harbour than that for which she was sailing, when seized by the Paul Jones, (although it is certainly a case for damages,) we are of opinion the damages should be moderate.

Sentence reversed.[a]

*a* Mr Justice STORY did not sit in this cause.