.THE CHICORA FERTILIZER COMPANY OF CHARLESTON, SOUTH CAROLINA, AND GEORGE A. WAGENER *vs.* PERLE P. DUNAN AND THOMAS M. LANAHAN.

*Agreement to Accept Less Than Amount of Debt Before Maturity in Full Satisfaction—Silence as to Material Fact Affecting Subject-Matter of Contract Known Exclusively by One Party—Fraud—Specific Performance—Tender in Equity.*

An agreement between a debtor and creditor by which the former agrees to pay, and the latter to accept, a smaller sum than the amount of the debt, before its maturity, in full satisfaction is valid and supported by a sufficient consideration.

When there is no fiduciary relation between the parties contracting with one another there is no obligation on the part of either to dis-

close a fact exclusively within his knowledge which may influence the value of the subject-matter, and mere silence as to such fact is not a fraudulent concealment.

A debtor, in straightened circumstances, pledged shares of stock in a fertilizer company with his creditor as security for the debt. At that time the shares were estimated to be worth about $30 each, but subsequently the property of the company was sold to another corporation at a price which doubled the value of the shares. While the negotiations for this sale were pending, the debtor being himself the principal promoter thereof, but before it was finally ratified by the purchasing corporation, the debtor made a contract with his creditor by which the latter agreed to accept about $2,000 less than the amount of his claim in full satisfaction, and to release the shares of stock pledged, which at their former value did not cover the amount of the debt. Afterwards the creditor learning of the sale which increased the value of the collateral held by him, refused to carry out the agreement, alleging that the debtor had fraudulently concealed from him the fact of the proposed sale. At the time the compromise agreement was made the debtor said nothing about the sale and stated that his compromise was the best settlement that he could make. Upon a bill for specific performance, *held*, that the silence of the debtor under these circumstances was not fraudulent in itself, or such a concealment as disentitles him from asking for specific performance of the contract.

The technical rules governing pleas of tender in actions at law are inapplicable in equity. Upon a bill to enforce specific performance of an agreement by defendant to accept a certain sum of money in satisfaction of a debt secured by pledged property, a sufficient tender is made when the bill avers that the plaintiff is ready, willing and able to pay the amount due or to bring the same into Court to be paid to the defendant upon the transfer of the collateral security.

Appeal from a decree of the Circuit Court for Baltimore City (WICKES, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE and JONES, JJ.

*George Whitelock* and *Frank G. Turner*, for the appellants.

There was no sufficient consideration for the forgiveness of the debt due the Chicora Company to the extent of $2,000, because there was no actual payment of the lesser sum agreed upon before maturity of the debt. *Geiser* v. *Kerchner*, 4 G. & J. 305, note; *Rohr* v. *Anderson*, 51 Md. 205.

The agreement of Dec. 3rd, 1898, was voidable at the option of the appellants because it was procured by deception or fraud.     In procuring an agreement, the concealment of an important fact which, if communicated, would have prevented the consummation of the agreement, constitutes such fraud or unfair dealing as entitles the injured party to promptly rescind the contract.    Dunan knew that the Rasin Company stock was, by his own efforts, made so valuable that it was more than sufficient to pay the Chicora Company's claim in full.    Notwithstanding the peculiar relation of trust and confidence existing between him and the Chicora Company, he concealed this fact, and thereby procured an agreement which could not have been obtained had he communicated this information to Wagener.    This information, " consisting of material particulars," rendered their position such that they did not " stand upon an equal footing."    Even if Dunan was " free of wrongful intent " in concealing it, the mere concealment is such reprehensible conduct that a Court of Equity will not decree specific performance as " all the material facts must be known to both parties.    It is against the principles of equity for one party to suppress a material ingredient."    *Ellard* v. *Lord Llandaff*, 1 Ball & B. 250; *Pomeroy's Equity Jurisprudence*, 2nd ed. 901 and 902, 956;  *Tate* v. *Williamson*, L. R. 2 Ch. 59; *Burch* v. *Sheldon*, 14 Bar. (N. Y.) 66; *A. & E. Ency.*, vol. 1, 428; *Stafford* v. *Bacon*, 1 Hill Rep. (N. Y.) 535; *Brown* v. *Montgomery*, 20 N. Y. 287; 2 *Kent's Com.* 482–3.

The relation existing between Dunan and the appellants was one which " demanded *open* and *fair dealing.*"    Very slight previous relations are alone necessary to make it the duty of one procuring a contract to disclose fully all the surrounding circumstances.    This was held in *Byars* v. *Stubbs*, 85 Ala. 259 (a suit for specific performance of an option), where Byars requested Stubbs by letter to act as his agent in the sale of certain property, located near Birmingham (Stubbs' residence), Stubbs compensation to be all secured over $500.    Stubbs *did not accept the agency,* but

the morning following the receipt of Byar's letter Stubbs went to Byar's home (100 miles distant) and there secured an option on the property for $500. He did not disclose the fact that there was a "boom" in property in and around Birmingham. The Court dismissed the bill for failure to disclose the fact of the "boom," which affected the value of the land, holding that the communication and authority to sell implied confidence and created a relation which required "open and fair dealings." How much more was it incumbent upon Dunan to disclose to Wagener the circumstances which had affected the value of the Rasin Company's stock held by the Chicora Company. *Tate* v. *Williamson*, L. R. 2 Ch. 64. On the same ground accord and satisfaction are void for suppression of any material statement, and in equity a sealed release under such circumstances will be set aside. *A. & E. Ency.*, vol. 1, 428; *Stafford* v. *Bacon*, 1 Hill, 535; *Dolsen* v. *Arnold*, 10 How. Pr. 528. As in a composition with creditors any departure from good faith in the slightest degree avoids the transaction, the strictest good faith being required. *Am. & Eng. Ency.*, vol. 6 (2 ed.) p. 392. And any misrepresentation or suppression will be fraud, such as false statement as to the amount of property, debts, etc. *Hefter* v. *Cahn*, 73 Ill. 296; *Levinge* v. *Gale*, 28 Ind. 486.

The fraud perpetrated by Dunan consists not only in suppression of material facts in procuring the agreement of December 3rd, 1898, but in the representation that his financial condition was bad, and that "he had nothing." This statement was untrue, for he had an equity in the Rasin Company stock, after paying the Chicora Company's claim in full, and he had moreover all of the rest of the $63,000, which was his net balance in March, 1898. The most active fraud, however, perpetrated by Dunan, is in the statement made to Whiting, (the Chicora Company's agent,) on Dec. 5th, 1898, (three days after the Directors' meeting, but while an option was still open), when he was asked by Whiting if it was true that the Virginia and Carolina

Company had bought out the Rasin Company. He (Dunan) then said, " there is not a word of truth in it, negotiations have been pending with a Northern syndicate, which, if carried out, would give the Rasin stockholders very little for their stock." This is absolutely uncontradicted evidence. Why was this untrue statement made ? Why was the concealment of the fact of the sale of the Rasin Company's plant concealed in conversation with Wagener ? The question is readily answered by the surrounding circumstances. For Dunan realized that if the truth was known, the appellants would never do as he desired. " A single word dropped is sufficient to defeat the principle, that a party can keep silent and be safe, if that word mislead."—Silence, moreover, which will not constitute fraud, will constitute such unfairness in a contract as to stay the hand of the Court. *Fry on Specific Performance*, 616, 617; *Turner* v. *Green*, [1895] 2 Ch. 205.

Notwithstanding Dunan was charged with fraud in the answer to his bill, and was by two witnesses represented as concealing material facts, grossly deceiving and falsifying, he (Dunan) kept silent and did not deny the charges which, if innocent, he could repel. " His silence," as this Court has recently said, (*Berger* v. *Bullock*, 85 Md. 443), " was a confession of his guilt."

Dunan has not performed or even tendered performance of, nor does he make tender in his bill to perform the agreement made in New York, December 3rd, 1898, which he now seeks to have specifically enforced. The agreement was to deduct two thousand dollars from the amount of his debt on December 3rd, 1898. This proposition was to be " held open until the 5th day of December." The balance due the appellants on December 3rd, 1898, was $15,633.29, deducting the $2,000, the true balance due was $13,633.29; therefore assuming the agreement binding and to be one which could be specifically enforced, the appellees are in no position to ask specific performance, for they have failed in the essential pre-requisite thereof, *i. e.*,

showing that they have performed all that they are required to do by the said agreement. *Fridge* v. *State*, 3 G. & J. 114; *Bamberger* v. *Johnson*, 86 Md. at p. 41; *Pomeroy's Equity Jurisprudence*, Par. 1407.

*Frank Gosnell*, for the appellees.

There was no overreaching by Dunan. No imposition or misleading conversation, bad faith or concealment. No confidential relations nor of trust or confidence existed between him and Wagener. Nor is this the case of a buyer complaining of concealment, fraud or misrepresentation of a vendor. But it is where a debtor and creditor are dealing at arms' length, where the compromise of a debt and its payment in advance is involved, and where the transfer of the securities to other hands, to be held for an indefinite time for the benefit of the debtor, is but an incident to the transaction. It is clear upon authority, that the pending negotiations for the sale of the Rasin Company property were not such material facts as Dunan should have disclosed to Wagener. *Turner* v. *Green*, [1895] 2 Ch. 205; *Fox* v. *Mackreth*, 2 Bro. C. C. 420; *Vernon* v. *Keys*, 12 East, 632; *Harris* v. *Tyson*, 24 Pa. St. 460; *Fleming* v. *Slocum*, 18 Johns. 405; *Byrd* v. *Rautman*, 85 Md. 414.

McSHERRY, C. J., delivered the opinion of the Court.

This proceeding was commenced by a bill in equity to procure the specific performance of an agreement proposed on the third and accepted on the fifth day of December, eighteen hundred and ninety-eight, and thus concluded between Dunan, one of the plaintiffs, and the Chicora Fertilizer Company, through Wagener, its treasurer and agent. The decree of the Circuit Court of Baltimore City was in favor of the plaintiffs and the defendants have appealed. The facts, which it is necessary to state in order that the legal questions involved may be properly presented, are disclosed by the pleadings and the evidence, and are as follows: Dunan was indebted to the Chicora Company in a

considerable sum for fertilizers purchased by him from it. When his payments fell due he was unable to meet them, and on June the twenty-second, 1898, a written agreement, under seal, was entered into between him and the company, whereby the sum of $5,089.98, part of the total indebtedness, was to become payable December the first, 1898, and the residue at later periods, which will be stated in a moment. As security for the payment of the first named sum Dunan delivered to the company bills receivable—promissory notes owing to him—aggregating $4,872.32; and these were to be collected by the company and applied to Dunan's indebtedness. The remaining indebtedness, amounting to $6,088.62, was made payable in equal instalments to fall due on the first days of January, February, March, April and May, 1899. As collateral security for this sum Dunan transferred to the company two hundred and twenty-one shares of the capital stock of the Rasin Fertilizer Company, and a claim of $3,333.33 which he held against the Chesapeake Guano Company. This stock had, however, been previously hypothecated to several banks for $5,800 due by Dunan to the banks. The Chicora Company paid this indebtedness and accordingly took the stock as collateral for the $6,088.62 due to the company and for the $5,800 advanced by it to liberate the stock from the antecedent pledge to the banks. The Chicora Company therefore held the stock as collateral for $11,888.62; but this stock by the terms of the agreement was not to be sold by the company before May the first, 1899. With the first part of the indebtedness practically settled by the transferred bills receivable, and not included in the $11,888.62 which formed the basis of the adjustment finally made; and with no portion of the other indebtedness, which was secured by the pledge of the Rasin Company's stock, yet due, Dunan met Wagener by appointment on December the third, 1898, in New York. At that interview this is what transpired, according to Dunan's testimony: " I met Mr. Wagener at the appointed time, and told him that I had a friend who would

be willing to lend me $9,000 in full payment for the amount due him of $11,888.62, and that was the best settlement I could make for some time to come; I told him that I was trying to get on my feet and would appreciate the settlement; he said he could not accept it, and after some thought, made me a proposition back of a difference on the account of $2,000; I asked him if he would hold the proposition open until the 5th day of December, until I could submit the same, as I did not have the authority to accept that settlement, which he agreed to; then I left him." Wagener's version of what took place is as follows: " I think he wanted me to reduce the account between twenty-five hundred and three thousand dollars on the whole claim; I finally agreed that if he could arrange with his friend or friends to settle the claim within $2,000, I was willing to lose $2,000 on the business to help him out." The proposition of Dunan having been met by this counter-proposition from Wagener, Dunan returned to Baltimore and conferred with Mr. Lanahan, who was to furnish the $9,000 already alluded to; and Dunan was finally authorized by Mr. Lanahan to telegraph Wagener accepting the proposal to abate the two thousand dollars and naming the fourteenth day of December as the time for payment. The telegram is in these words: " My party accepts our transaction, will pay over money Wednesday, December 14th, for the two accounts, net nine thousand eight hundred and eighty-eight, less number of empty bags now on hand your works at five cents. This is agreeable to your proposition." On the same day Wagener wrote in reply: " Your two telegrams are to hand, and I will attend to the matter when I reach Charleston. I will leave here on Friday. Send me to Charleston a memorandum of bags. I presume you wish me to draw with securities attached to draft." This is the agreement which the Chicora Company afterwards refused to carry out; and it is to procure a decree requiring it to be specifically performed that the pending bill was filed.

The first question which arises is, whether this contract

is valid and binding.  Before, however, discussing that question the reasons assigned by the Chicora Company for its non-performance of the agreement will be stated and thus a connected narration of the facts will be preserved.

When this agreement of December the third and fifth was made, negotiations were pending, and had been pending some while before, between the Rasin Company, through Dunan, and the Virginia and Carolina Chemical Company, for the purchase, by the latter, of the real estate and factory of the former ; and on December the second Dunan submitted to the Board of Directors of the Rasin Company a proposition for that purchase.  A meeting of the Rasin Company stockholders was called to assemble on the twelfth of December to consider the proposal.  Dunan was not aware when he made the agreement of December the third and fifth that this meeting had been called.  He did not know whether the sale would be consummated or not.  When the Rasin Company stock owned by Dunan was pledged to the Chicora Company it was worth, as was supposed, something over thirty dollars a share, though Mr. Lanahan had told Wagener, prior to the pledge being made, that the stock was worth considerably more, and Wagener considered it good collateral.  On December the twelfth, the proposal of sale was accepted by the stockholders of the Rasin Company, and a price was obtained which made the stock worth sixty-two dollars a share when the Rasin Company went into liquidation.  Dunan's stock having been transferred to Wagener, the Chicora Company received, after the liquidation commenced, a dividend of thirty dollars per share on February the third, 1899 ; and as there were two hundred and twenty-one shares, it got in cash $6,630.  This sum with the value of the bags belonging to Dunan and in the company's possession, made $6,752.65.  Deducting the $2,000 allowed by the agreement of December the third and fifth from the total indebtedness of $11,888.62 leaves $9,888.62, and subtracting from that the $6,752.65 just named, makes the amount due

by Dunan $3,125.97. This sum the plaintiffs tendered themselves ready to pay, or to bring into Court to be paid, the Chicora Company. Because the Rasin stock became more valuable, by reason of the sale of the Rasin Company's property, than it was when pledged, the Chicora Company refused to carry out the agreement of December the third and fifth, to abate two thousand dollars of its claim against Dunan ; and it is alleged that the failure of Dunan to communicate to Wagener, when that agreement was made, the fact that a proposal to purchase the Rasin Company property had been submitted, was such a concealment of a material circumstance which ought to have been disclosed, as to render the agreement for an abatement null and void. And this is the second legal question brought up by the record.

Something was suggested in the argument about Dunan having received a commission amounting to nearly six thousand dollars for effecting the sale of the Rasin Company's property ; and it was contended that he ought also to have apprised Wagener of that ; but we need only observe in relation to that subject that no part of that commission went to Dunan, because the whole of it was applied to the payment of a debt which he owed to another person. The commissions relieved him from that debt, but did not put him in funds, and of funds he was apparently greatly in need.

It is perfectly true that the interposition of a Court in granting relief by the enforcement of a contract is not a matter *ex debito justitiæ ;* but is one of sound judicial discretion controlled by established principles of equity. To warrant the Court's interference, the terms of the contract must be fair *at the time it was made,* for it is immaterial that it has become less beneficial to one of the parties by force of subsequent circumstances, unless the change is due to the fault of the party seeking to enforce it. *Cochran* v. *Pascault,* 54 Md. 18. It must be founded on an adequate consideration, and must be made under circumstances which

favorably commend it.   In every case the question must be whether the exercise of the power of the Court is demanded to subserve the ends of justice, and unless the Court is satisfied that the agreement is right in all respects it refuses to interfere.

We come, then, to consider the two questions already. mentioned ; viz., whether the agreement of December the third and fifth was valid, because founded on a sufficient consideration ; and whether the silence of Dunan—his failure to voluntarily disclose what he knew in respect to the pending negotiations for the sale of the Rasin Company's property—amounted to a fraudulent concealment, or if not fraudulent whether it constituted such a concealment as will prevent the enforcement of the agreement in a Court of Equity.   There is a subsidiary inquiry relating to the sufficiency of the tender, but that will be considered later on.

Confessedly less money was to be paid under the agreement of December the third and fifth in settlement of the whole of Dunan's indebtedness than was in fact due by him to the Chicora Company under the contract of June 22d. The payment of a less sum than is actually due, or an agreement to pay a less sum will not of itself, release the residue.   *Geiser* v. *Kershner*, 4 G. & J. 305.   And this is so because a mere agreement, without consideration, to accept a less sum than a debtor owes, and to accept it in full satisfaction of all that he does owe is simply a *nudum pactum* and cannot be enforced.   But that is not the situation we are dealing with.   We have here, it is true, an agreement to accept in full satisfaction a sum which is two thousand dollars less than the amount really due ; but there is besides this a consideration underlying the agreement and beneficial to the creditor which supports his promise to make the abatement.   There is nothing unlawful, immoral or against public policy in a creditor agreeing to accept in full settlement less than is due by his debtor. Such an agreement is neither *malum in se* nor *malum pro-*

*hibitum.* Like other ordinary, every day contracts it must not be inequitable in its terms and effects or a Court of Equity will not enforce it. It must have an adequate consideration to support it, and there must be a readiness and ability on the part of the debtor to perform his part of the undertaking. If these conditions or constituents exist there is no reason which can be suggested why a contract of the kind we now have before us should not be specifically enforced by a Court of Equity. That a distinct and definite agreement to abate two thousand dollars of the indebtedness was entered into conditionally on December the third, and was finally closed on the fifth, is abundantly clear from the evidence. The testimony of Dunan is explicit to this point. He made a different proposal, to be sure, but that was met by a counter-proposition which Dunan was unable, at the moment, to accept. When he subsequently saw Mr. Lanahan and procured authority to pay the larger sum demanded by Wagener, and to pay that sum in acceptance of Wagener's offer, Dunan at once telegraphed his acceptance, designating the precise amount to be paid ; and Wagener wrote on the same day after the receipt of that telegram that he would attend to the matter when he reached Charleston. He did more : He requested Dunan to send a memorandum of the bags, which at an agreed value were to be taken in part payment, and he added, "I presume you wish me to draw with securities attached to draft." These securities were the shares of Rasin Company stock and the account against the Chesapeake Guano Company. There is no uncertainty about this contract. It was a clear, express agreement to accept in settlement of the $11,888.62 indebtedness, the sum of $9,888.62 less the value of the bags owned by Dunan and then at the Chicora Company's works. The telegram and letter of December the fifth in conjunction with the verbal testimony of Dunan and Wagener can mean nothing else. The contract being thus definite and definitely proved, is it inequitable in its terms and effect and was there a sufficient consideration to support it ?

Upon the surface, at least, there is nothing inequitable in the contract. A creditor has a perfect right to give up a part of his claim if he chooses to do so. It cannot be affirmed of a contract by which a creditor abates a part of his claim, that the fact of an abatement being made is, in itself, inequitable as respects the creditor who makes the abatement. If the contract was procured by fraud or deception then quite another question arises, which concerns, not the equitable or inequitable character of the contract, but its validity. Whether fraud or deception influenced the making of the agreement is a subject which will be discussed when we come to consider the second of the two questions which underlie this case. Was there an adequate consideration supporting the promise to abate? That is the inquiry which is now to be answered.

A consideration is " any benefit to the promisor, or any loss, trouble or inconvenience to, or charge upon, the person to whom the promise is made. " *Emerson* v. *Slater*, 22 How. 43. " Either benefit to the promisor, or detriment to the promisee is sufficient." *Brantly, Con.*, 57. Accordingly it has been held by this Court that if in addition to the part payment of a debt there be some other collateral consideration, such as in law is sufficient to support a contract, then the agreement to relinquish the residue is not *nudum pactum*; and the payment of less than the whole debt with the superaddition of such collateral consideration makes a good accord and satisfaction. A " collateral or additional consideration may consist of anything " said this Court, " which would be a burden or inconvenience to the one party or a possible benefit to the other." *Maddux* v. *Bevan*, 39 Md. 499; *Booth* v. *Campbell*, 15 Md. 569. In the case just referred to in *39 Md.*, a guaranty by a responsible party of a portion of the indebtedness of a debtor in failing circumstances was held to be a sufficient consideration to support an agreement by the creditor to relinquish the residue. The actual payment of the amount agreed to be paid by Dunan would have

constituted a good accord and satisfaction if the collateral consideration relied on was sufficient to support the agreement; but the question is, not whether there has been an accord and satisfaction, but whether there was a valid consideration for the agreement of December the third and fifth ; and if there was, whether the failure of the creditor to perform his part of that agreement, by refusing to accept the money, precludes a Court of Equity from enforcing it. An agreement which is sufficient to support a plea of accord and satisfaction, when but part of a sum due has been paid and accepted in discharge of the whole, is an agreement founded on a valid consideration ; and it is obvious that the sufficiency of the agreement is altogether independent of the fact of payment. If then the agreement is binding *after* the payment of a less sum, but not *because* of the payment of a less sum, it is equally binding *before* payment, because founded on a consideration *other than* the payment; and a refusal of the creditor to perform that agreement cannot upon any known principle change it from a valid into an invalid agreement.

Now, the agreement, of December the third and fifth, undoubtedly imposed an additional burden on the debtor, Dunan, and conferred a benefit on the creditor, the Chicora Company. It required Dunan to pay his indebtedness several months before it was due, and it gave to the Chicora Company the advantage of receiving the amount agreed to be paid considerably in advance of the maturity of the debt, and enabled it to receive in cash and property what it consented to accept without being obliged to wait, under the contract of June 22d, until the first of May, 1899, before realizing on the collateral. This was an adequate consideration to support the promise to reduce the indebtedness to $9,888.62 as stipulated. The agreement to relinquish a part of the debt was therefore not *nudum pactum.* Such has been the distinct ruling of the Supreme Court in *Very* v. *Levy,* 13 Howard, 345. These were the facts. On March 3rd, 1841, Levy executed

his writing obligatory for the sum of four thousand dollars
bearing seven per cent interest, payable to Lindslay in six
years after date, and secured the same by a mortgage on
real estate.   By assignment from Lindslay on March 25th,
.1841, Very became the owner of the bond and mortgage.
·Four years before the bond fell due Levy agreed with Very
to deliver to the latter within twelve months from March,
1843, jewelry at reasonable prices in satisfaction of the
bond and mortgage, and actually did deliver part of the
goods to the value of nearly nineteen hundred dollars, and
was ready to deliver the remainder, which he kept on hand
for the purpose.   In April, 1848, after the maturity of the
debt Very filed a bill to foreclose the mortgage securing
.the bond, and Levy set up in defense the agreement for a
·settlement in jewelry.   The Circuit Court of the United
:States, for the District of Arkansas, ascertained the amount
.of goods necessary to satisfy the unpaid residue of the
bond, and ordered the goods to be delivered to the com-
plainant, on demand, in full satisfaction of the bond and
mortgage, decreed the mortgage satisfied and directed the
-complainant to pay the costs.   This decree was affirmed by
.the Supreme Court and in the course of its judgment it
was said :  " That the agreement itself imports a considera-
tion, deemed by the law valuable, there can be no doubt.
An agreement to give a less sum for a greater, if the time
of payment be anticipated, is binding ; the reason being as
·expressed in *Pennel's case*, ·5 Co. R. 117, that peradven-
·ture parcel of the sum before the day, would be more bene-
ficial than the whole sum on the day.   *Coke's Lit.*, 212 b;
*Com. Dig..* Accord, B. 2;  *Brooks* v. *White*, 2 Met. 283."
*Savage* v. *Everman*, 70 Pa. St. 319; *Lincoln Sav. Bk.* v.
*Allen*, 82 Fed. R. 148.   It is needless to multiply citations
in support of a proposition so clear on principle.

Such a contract may unquestionably be enforced in equity.
" On the broad principle that what has been agreed to be
done, shall be considered as done, the Court will treat the
creditor as if he had acted conscientiously, and accepted in

satisfaction what he had agreed to accept, and what it was his own fault only that he had not received." *Very* v. *Levy*, *supra.*

Was Dunan under any legal obligation to disclose to Wagener the facts which he, Dunan, knew in regard to the pending negotiations for the sale of the Rasin Company's property to the Virginia and Carolina Fertilizer Company; and does his failure to disclose what he knew on that subject invalidate the agreement of December the third and fifth, or furnish a ground for a Court of Equity to deny specific performance of the contract?

There was no false statement made by Dunan to Wagener, nor was there the suppression of a fact. He was asked no question which required him to divulge what he knew. He was simply silent. There is a distinction between the suppression of a fact and mere silence. Where there is an obligation to speak a failure to speak will constitute the suppression of a fact; but where there is no obligation to speak silence cannot be termed suppression. In *Walters* v. *Morgan*, 3 DeG. F. & J. 718, LORD CHANCELLOR CAMPBELL said: " There being no fiduciary relation between vendor and purchaser in the negotiation the purchaser is not bound to disclose any fact exclusively within his knowledge which might reasonably be expected to influence the price of the subject to be sold." In *Laidlaw et al.* v. *Organ*, 2 Wheat. 123, the facts were that the plaintiff, Organ, purchased from Laidlaw & Company one hundred and eleven hogsheads of tobacco on February 19th, 1815. On the night of the eighteenth some gentlemen brought, to New Orleans from the British fleet, tidings that a treaty of peace had been signed at Ghent by the American and British Commissioners. This news was communicated to the plaintiff on the morning of the nineteenth. Thereupon, though it was Sunday, the plaintiff called at once on one of the members of the firm of Laidlaw & Company, who was ignorant that peace between the United States and Great Britain had been concluded, and, without revealing to the

vendors this information, purchased the tobacco at from thirty to fifty per cent less price than the article commanded as soon as the news of peace became generally known. There was no evidence tending to show that the plaintiff had asserted or suggested anything to the vendors calculated to impose upon them with respect to the news of peace, or to induce them to think or believe that it did not exist. CHIEF JUSTICE MARSHALL said: " The question in this case is whether the intelligence of extrinsic circumstances, which might influence the price of the commodity, and which was exclusively within the knowledge of the vendee, ought to have been communicated by him to the vendor? The Court is of opinion that he was not bound to communicate it. It would be difficult to circumscribe the contrary doctrine within the proper limits, where the means of intelligence are equally accessible to both. But at the same time, each party must take care not to say or do anything tending to impose upon the other." See also *Jackson* v. *Combs*, I L. R. A. 742, and cases in note; 28 *Am. & Eng. Ency. Law*, III; 14 *Am. & Eng. Ency. L.* (2nd ed.) 66. CHITTY, J., after quoting from *Watters* v. *Morgan*, *supra*, the dictum of LORD CHANCELLOR CAMPBELL transcribed above, observed: " That is a correct statement of the law, and one which, it appears to me, is not to be confined to the sale of lands or goods, but is of general application, except, perhaps in the case of contracts requiring *uberrima fides*, which involve a duty to make full disclosure." *Turner* v. *Green*, 2 Ch. (1895) 205. In *Turner* v. *Green*, *supra*, the precise question arose which is involved in the case at bar. There was an application in that case to enforce the terms of a contract for the compromise of an action; and the defendant resisted the application on the ground that the contract was not binding on him, because when the contract for the compromise was made, the solicitor for the plaintiff did not disclose a material fact which he knew, but which the defendant did not know, and which if he had

known would have prevented him from making the contract. It appeared that a suit was instituted, wherein the plaintiff claimed an account from the defendant as his alleged manager, and a declaration that, under the circumstances, the defendant was not entitled to exercise a certain option of purchase. On January the eleventh, 1895, the summons came on for hearing before the chief clerk in London, who after going fully into the evidence was of opinion that the summons ought to be dismissed with costs ; the summons was then adjourned to the Judge at the instance of the plaintiff. At 3.30 p. m. in the afternoon of the same day, Fowler, a member of the firm of solicitors acting for the plaintiff, arranged the terms of a compromise of the action with the defendant and his solicitors at Portsmouth. When this compromise was entered into and signed by the defendant, the result of the proceedings before the chief clerk, and which was in the defendant's favor, had been telegraphed to Fowler, but was not known either to the defendant or to his solicitors. The information contained in the telegram was not communicated by Fowler to the defendant or his solicitors at this interview. The defendant alleged that had he known the result of the proceedings before the chief clerk he would not have agreed to the compromise, and declined to be bound by the compromise. The proceeding was treated as though it were an action for specific performance of the agreement to compromise. " The question thus raised," said JUSTICE CHITTY, " is not one of fraud, but one as to the doctrine of the Court in granting relief against a claim for specific performance, where the Court has a discretion ; but that is, of course, a judicial discretion, which cannot be exercised arbitrarily, but only according to settled principles laid down for it by the authorities. I will take the proposition laid down by SIR EDWARD FRY in his book (3rd ed., page 325, par. 705), as a good exposition of the law ; there he says : ' Mere silence as regards a material fact which the one party is not under an obligation to dis-

close to the other cannot be a ground for rescission or a
defense to specific performance.' It cannot be contended
that Fowler was under any obligation to disclose the re-
sult of the telegram, therefore, Mr. Butcher, who argued
his case with skill and ingenuity, was driven to say that it
was a shabby trick on Fowler's part not to disclose the in-
formation he had received, and that such conduct was not
consistent with the usual practice of solicitors of high
standing in their dealings with one another, who would
ordinarily have disclosed any such circumstance ; therefore,
he argued, that specific performance ought to be refused,
because the course adopted in this case would be generally
condemned by high-minded men. I find myself unable to
act judicially on any such ground. Had there been any
overreaching by Fowler, or any misleading conversation
with reference to the proceedings in London before the
chief clerk, at the time the terms of the compromise were
settled, a *very different case might have been* presented on
behalf of the defendant, and in such a case an obligation
might have arisen binding Fowler at law or in equity to
make a disclosure of all he knew ; but I am satisfied on
the evidence that no conversation on the subject took
place.   *   *   *   I come to the conclusion that Mr.
Fowler's silence, in the circumstances of this case, is not
sufficient ground for my refusing specific performance ; and
I shall make the order accordingly."

"Simple silence," again quoting from *Walters* v. *Morgan*,
*supra*, "does not amount to legal fraud, however it may be
viewed by moralists. But a single word, or (I may add) a
nod, or a wink or a shake of the head, or a smile from the
purchaser intended to induce the vendor to believe the
existence of a non-existing fact, which might influence the
price of the subject to be sold, would be sufficient ground
for a Court of Equity to refuse a decree for a specific per-
formance of the agreement." Now, these are all affirma-
tive acts ; but Dunan did nothing affirmative. He simply
said nothing. He was under no obligation to speak. He

occupied no fiduciary relation. He and the company held the relation of debtor and creditor and that is not a relation of confidence. 14 *Am. & Eng. Ency. Law,* (2nd ed.) 72. As, then, Dunan was under no obligation to disclose what he knew, particularly since, according to Wagener, it was notorious in Baltimore, before the agreement of December the third and fifth was made, that negotiations were in progress which were likely to increase the value of the pledged stock ; Dunan's failure to reveal the information which he had was neither a fraudulent concealment that vitiated the agreement, nor a suppression of fact that will stay the hand of a Court of Equity from specifically enforcing the agreement.

On the question of tender it is only necessary to say that the technical rules governing pleas of tender in actions at law are inapplicable in equity. "To entitle the purchaser to demand a deed it is sufficient that he is ready and offers to comply with the contract on his part, and has the ability to perform it." *Smoot et al.* v. *Rea & Andrews,* 19 Md. 406; *Maughlin* v. *Perry & Warren,* 35 Md. 358. The bill avers that the plaintiffs "now tender themselves ready, willing and able to pay the said Chicora Company," the designed amount due, "or to bring the same into Court to be paid to the said Chicora Company upon the transfer" to Mr. Lanahan of the collateral. This is a sufficient tender in equity under a bill like the one before us.

Finding no error in the decree appealed from, it will be affirmed with costs above and below ; and it is so ordered.

> *Decree affirmed with costs above and below.*

(Decided April 20th, 1900.)

PEARCE, J., dissented and delivered the following opinion :

It is with diffidence and reluctance that I venture to dissent from any opinion of the Court, believing as I do, that in most cases of difference of opinion, I am treading the path of safety in following the united judgment of my as-

sociates, but the decision of the main question involved in this case is one of much importance as a judicial precedent, and as I have not been able, after careful consideration, to adopt the view of the Court upon that question, I think it proper to state why I cannot do so.

The history of the transaction which led to this suit, as I understand the facts of the record, may be thus condensed: On December 2nd, 1897, Dunan contracted in writing to purchase of the Chicora Company one thousand tons of fertilizer to be delivered before May 1st, 1898, for which payment was to be made as follows: $5,089.98 to be paid cash May 1st, 1898; $3,029.23 by note due September 1st, 1898, and $3,059.39 by note due November 1st, 1898. By the terms of the contract the vendor reserved the right of cancellation in case of any occurrence it might regard as unfavorable to the purchaser's credit. In March, 1898, a portion of the fertilizer having been shipped to Dunan, further shipments were suspended in consequence of information communicated by Clarence C. Whiting, the broker through whom the sale was made, that Dunan was defaulting on notes to other persons for fertilizers purchased, and on March 7th, 1898, Dunan made a statement to Whiting of his financial condition, showing net assets of $63,000 over all liabilities, whereupon shipments were resumed, and the goods were all delivered prior to May 1st, 1898. Dunan did not pay any part of the cash due May 1st, 1898, nor did he deliver the two notes maturing September 1st and November 1st, 1898, and on June 4th admitted his inability to make any cash payment whatever. In consequence of this inability, a sealed agreement was made June 22nd, 1898, by which payment of the $5,089.98 due May 1st, 1898, was extended to December 1st, 1898, and the payment of the $6,088.62, for which notes should have been given as before stated, was extended so as to cover five instalments, due, respectively, January 1st, February 1st, March 1st, April 1st and May 1st, 1899. As security for the $5,089.98, Dunan assigned certain bills receivable to

amount of $4,872.32, and as security for the $6,088.62, he assigned 221 shares of the stock of the Rasin Fertilizer Co. owned by him, but which were hypothecated with certain banks for loans aggregating $5,800.   The Chicora Co. agreed to pay off these loans, and hold the stock till May 1st, 1899, as security for the $6,088.62, and upon payment in full to assign the stock to Dunan.   As further security for the $6,088.62 Dunan assigned a claim of $3,333.33 against the Chesapeake Guano Co., then in the hands of receivers, which claim has been ascertained to be entirely worthless.   The Chicora Co. paid off the amount of hypothecation, $5,800, and held the stock as agreed on, the evidence showing that the market value of the stock in June, 1898, and up to the sale, hereafter to be mentioned, was about $30 per share, or $6,630 for the 221 shares, being only $830 above the hypothecation.

About November 15th, 1898, Dunan was employed by the Rasin Fertilizer Co. as agent to effect a sale of its plant to the Virginia and Carolina Chemical Co., which sale was consummated December 15th, 1898, upon terms which raised the value of the stock of the Rasin Fertilizer Co., on liquidation, to about $62 per share, or more than double the amount for which it was pledged to the Chicora Co. and for which sale Dunan received a commission of about $6,000.   This sale was proposed to the stockholders by a resolution of the directors passed December 2nd, 1898, and *was approved by the stockholders at a meeting held December 12th, 1898,* Dunan being present at that meeting, and Mr. Lanahan being present both at that meeting and at the directors' meeting December 2nd, 1898.

·On December 3rd, 1898, Dunan having gone to New York, wrote Wagener, the treasurer of the Chicora Co., through whom the agreement of June 22nd had been made, and who was then in New York, requesting an interview, which was held that afternoon.   Dunan testifies that he then told Wagener he had a friend who would lend him $9,000 with which to settle the claim of $11,888.62 *and that this was the best*

*settlement he could make*, but that he did not state who his friend was, nor did he allude to the action of the directors of the Rasin Fertilizer Co. on the previous day, nor to the fact that negotiations were pending for the sale of its plant, which if consummated would appreciate the value of the stock largely and give him in addition a commission of $6,000; that Wagener declined to make the abatement asked, but finally consented to abate $2,000, and agreed at his request to hold this offer until December 5th, to enable him to submit it to his friend. Wagener testifies that at that interview Dunan told him, with tears in his eyes, that he had been very unfortunate, *and had nothing*, and that he consented to abate $2,000 from the claim because he sympathised with Dunan and wished to help him, and also wanted to wind up the matter ; that at that time, neither he nor any of the officers of the Chicora Co. had any knowledge of the action of the directors of the Rasin Fertilizer Co. on the previous day, or of the pendency of the negotiations for the sale of its plant, but that Dunan said his friend would carry the stock for him, if he would settle the claim. Whiting testifies that he heard on the street in Baltimore, December 5th, that the Rasin Fertilizer Co. had been purchased by the Virginia and Carolina Chemical Co. and that he at once called on Dunan and asked him if it were true, and Dunan replied, *there was no truth in it ;* that negotiations *had been pending* with a Northern syndicate, which, if carried out, would give the Rasin. Co.'s stockholders *very little for their stock*, but added that he had arranged with Wagener to give him his money. Whiting says he learned later in the day, definitely, that the sale had been made, and so wrote the Chicora Co. Wagener says the Chicora Co. advised him of their information from Whiting, and that he was very angry that Dunan should have gotten him *in that way* to make a reduction on a just claim, and that he went to Baltimore, December 9th, to see Dunan, but Whiting advised him not to do so, as he was provoked and angry, and that he acted on this advice, and

wrote Dunan that he would refuse to be bound by the agreement thus procured.   The bill was filed April 27th, 1899, alleging that under the agreement set up by Dunan, Wagener was bound upon payment of the claim, less $2,000, to assign to Mr. Lanahan the 221 shares of Rasin Fertilizer Co. stock which he held, and for this reason Mr. Lanahan was made party plaintiff, and Wagener a party defendant.   I concur in the conclusion reached by the Court that the agreement was supported by a sufficient consideration, and cannot be regarded as *nudum pactum*, but I cannot concur in the conclusion that it is such an agreement as should be enforced by a Court of Equity, when the means by which it was procured are known and considered.

It has long been settled law that the interposition of a Court of Equity in granting relief by the enforcement of any contract is not a matter of right in the litigant, but is one of sound judicial discretion, controlled by established principles of equity, and in dealing with these questions, so frequently arising upon every variety of facts and circumstances, the Courts have stated the law with a corresponding variety of language and wealth of illustration.   Thus in *Gurley* v. *Hiteshue*, 5 Gill, 217, JUDGE CHAMBERS said: "A Court of Equity, professing as it does to lend its aid exclusively to cases in which a claim can be *conscientiously* enforced, will never coerce the specific performance of a contract for a party who has not acted fairly, openly, and without suppression of an important fact.   Whether with a fraudulent design or innocently, *yet if a false impression has been conveyed, and made the basis of the contract*, this extraordinary jurisdiction of the Court will not be exercised by coercing a specific performance."

In *O'Brien* v. *Pentz*, 48 Md. 577, JUDGE STEWART said: " To warrant the interference of a Court of Equity, the contract must be mutual and equal in all its parts, and have no circumstances of suspicion as to its *bona fides*, and it must be made under circumstances *commending it to the favorable apprehension of the Court.*"

In *Ellard* v. *Llandaff*, 1 Ball & Beatty, 240–1, specific performance of an agreement for a lease, in consideration of the surrender of an old lease, was refused, the tenant having failed to disclose the fact that the life on which the old lease depended was, when the agreement was signed, *in extremis;* LORD CHANCELLOR MANNERS saying, "All the material facts must be known to the parties, and is it not against all principles of equity that one party, knowing a material ingredient in an agreement, shall be permitted to suppress it and still call for a specific performance?" These illustrations will suffice to show that the power to coerce specific performance ought not to be exerted, whatever be the form of the contract, or its technical legal validity to sustain an action for its breach, when, upon all the facts and circumstances, it does not commend itself to the Court as secured by fair and open dealing, and as establishing a precedent promotive of the principles of justice.

The learned Judge of the Circuit Court stated in his opinion that he regarded the evidence as showing that Wagener considered the stock he held as collateral abundant to secure the indebtedness, and as establishing the fact that his motive in making the abatement was, first to close up promptly a business transaction, and secondly, to help an impecunious debtor, and that it could not therefore have been material to either consideration that the stock would probably advance as a result of the sale to the Virginia and Carolina Chemical Company; and in consequence of this view, the Court held that the mere silence of Dunan as to the pending negotiations for sale, and its probable results, did not amount to fraudulent concealment, and did not operate to vitiate his contract or prevent its enforcement in a Court of Equity, But an examination of the testimony has led me to a different conclusion.

It will be borne in mind that this stock, on June 22nd, 1898, was pledged for loans of $5,800, and that in order to get possession of it the appellant was obliged to pay off these loans, thereby increasing Dunan's indebtedness to

him by that amount.  Looking first to the face of the
agreement of June 22nd, it would not appear that the stock
was regarded by the appellant as ample security, since
Dunan was required to assign a claim of over $3,000 against
the Chesapeake Guano Co. as further security, though this
has since proved to be of no value.   Wagener, who man-
aged the transaction, testifies that he thought in taking up
this stock he was taking a *speculative* risk almost; that he
did not know its value, but had heard some had been sold
at about $30, and that Mr. Lanahan told him " he thought
it *might become valuable*."   Whiting, who acted in conjunc-
tion with Wagener, testifies that he made some investigation
about it, and learned from Mr. Homer, of the Second Nat.
Bank, that the stock had been offered sometime back at
$40, and that a large block had been offered in Richmond
at $30, but that Wagener's idea was to get any security that
was possible, and he decided to lift the load of $26 per
share, and carry it for Mr. Dunan as collateral; that his
recollection was Wagener put it at $40, as a basis of calcu-
lation, and that on that basis there was still a considerable
amount uncovered, and that the claim against the Chesa-
peake Guano Co. was assigned to fill out that deficit.   Mr.
Lanahan testified that Wagener asked him what he knew
about this stock ; that Dunan proposed to assign it to them
as collateral security for their debt, and that he told him he
was a considerable holder of this stock, and that he thinks
he told him he considered it perfectly good.   It does not
follow, because Mr. Lanahan thought the stock perfectly
good, that the appellant regarded that assigned to it as
ample security for its debt.   There is nothing to show that
Mr. Lanahan knew the amount of the debt, the number of
shares assigned, or the fact that the appellant was required
to advance $26 per share to get possession of it.   The tes-
timony of Wagener and Whiting is clear and uncontradicted,
that it was not regarded as sufficient security, and that for
this reason further security was required for the deficit of
$3,040 shown to exist upon the basis of $40, at which the

stock was estimated by Wagener in the transaction. The language of Mr. Lanahan, as stated by Wagener, "that he thought the stock *might become valuable*," is suggestive rather of *future anticipated protection*, than of present actual protection, and made it only more incumbent upon Dunan in his negotiation for an abatement to withhold nothing bearing upon the appreciation of the stock since its assignment. I cannot therefore agree with the Circuit Court that Wagener believed the collateral was ample security, and that any rise in value was immaterial to his motives in making the abatement, on the suggestion that it would enure only to the benefit of the debtor. I think the fair inference to be drawn from all the evidence is that Wagener regarded this stock as of uncertain and fluctuating value, and thought it better, in view of Dunan's failure to comply with any part of his original contract, and of his representation of his utter inability to comply with any condition of the extension of June 22nd, to secure the settlement offered in December, 1898, rather than to await the realization of the opinion of Mr. Lanahan that the stock might *become more valuable*, of the prospect of which *he* had neither knowledge nor means of knowledge. I cannot doubt that if Dunan had disclosed to him the fact that a sale of this stock, which would raise its value to $62, and give Dunan a commission of $6,000 had been approved by the directors, and only awaited the ratification of the stockholders, the agreement never would have been procured.

Nor can I regard this as a case of mere silence on the part of Dunan, not vitiating his contract, nor preventing its enforcement in equity. For this position, reliance was had upon *Laidlaw* v. *Organ*, 2 Wheaton, 195, and *Turner* v. *Green*, [1895], 2 Ch. 205. I have already referred to *Ellard* v. *Llandaff*, 2 Ball & Beatty, 250, as laying down the rule by which I think this case should be governed, upon the principle so well stated by Sir Edward Fry, that "silence which would not constitute fraud, may yet constitute such unfairness in a contract as to stay the hand of the Court;"

and which is quoted in *Turner* v. *Green*, where *Ellard* v. *Llandaff* was mentioned, with a possible suggestion of disapproval, though admitting that its authority had not been questioned by any reported case.

In *Laidlaw* v. *Organ*, *supra*, the question was whether the intelligence of the signing of the treaty of Ghent, which materially affected the price of goods bargained for, and which was exclusively within the knowledge of the vendee, ought to have been communicated by him to the vendor. The United States District Court directed a verdict for the plaintiff. On error to the Supreme Court, the judgment was reversed, JUDGE MARSHALL saying, it is true, "The Court is of opinion he was not bound to communicate it," but adding immediately thereafter, "It would be difficult to circumscribe the contrary doctrine within proper limits *where the means* of intelligence are equally accessible to both parties. But, at the same time, each party must take care not to say or do anything tending to impose upon the other. The Court thinks the absolute instruction of the Judge was erroneous, and that the question *whether any imposition was practiced by the vendee upon the vendor ought to have been submitted to the jury.*" We think it is obvious therefore, that if that had been an application for specific performance, it would have been refused, and the vendee would have been left to his action for damages.

The case of *Turner* v. *Green*, 2 Ch. Div. 205, decided in 1895, presents the appellee's case probably as strongly as any which can be adduced, but I cannot think it should be adopted to control this case. The application there was for the specific enforcement of an agreement to compromise a pending action, which the defendant claimed ought not to be enforced, because the plaintiff, being aware that the clerk, before whom some preliminary proceeding was pending, had expressed an opinion (not amounting to a decision) favorable to defendant, did not disclose this fact to the defendant when the compromise agreement was made, and it was held that plaintiff's silence, under the circumstances

of that case, was not sufficient ground for refusing specific performance, JUSTICE CHITTY adopting as a correct exposition of the law the text of SIR EDWARD FRY, "that mere silence as regards a material fact, which the one party is not under obligation to disclose to the other, cannot be a ground for rescission or a defense to specific performance." Conceding this to be a correct proposition of law, it leaves for determination in each case what facts are not required to be disclosed.   In that case it was held that plaintiff was under no obligation to disclose the clerk's expression of opinion, presumably because the defendant had the same means of knowledge as the plaintiff, and JUSTICE CHITTY proceeded to say that if there had been any overreaching by plaintiff, or *any misleading conversation with reference to the proceeding before the clerk*, a different case might have been presented, in which an obligation might have arisen binding plaintiff to disclose all he knew.   He also adopted as a correct statement of the law, LORD CAMPBELL's language in *Walters* v. *Morgan*, 3 D. F. & J. 718, that, " simple reticence does not amount to legal fraud, however viewed by moralists ; but a *single word*, or a smile, from one party intended to induce the other party to believe the existence of a non-existing fact, which might influence the making or declining of the contract, would be a sufficient ground to refuse a decree for specific performance." This statement he says is correct, and " is of general application, except perhaps in the case of contracts requiring *uberrima fides*, which involve a duty to make full disclosure, and that wherever there is an obligation to disclose, the non-disclosure is a defense to a specific performance action." It might be argued with great force, within the lines of *Turner* v. *Green*, that this is a contract requiring *uberrima fides* and carrying with it the obligation of full and frank disclosure, since the parties were not dealing at arm's length.   Dunan had not invited the appellant to a trial of skill and shrewdness in bargaining, but had appealed to its generosity for a release from a concluded contract, and for the abatement

of a large part of the debt incurred thereunder. But I shall not discuss this question, because I think the testimony shows that the appellant was misled by the *conduct and statements* of Dunan, and that the agreement was procured by those means, and therefore, upon all the authorities, ought not to be enforced.

Wagener testified that when Dunan saw him in New York, December 3rd, and asked for an abatement of $3,000, he told him "*he had nothing.*" Now while this may have been true at that moment, it was also true that the moment the sale, which had been approved by the directors, was ratified by the stockholders, he would have his commissions of $6,000, and the difference between the stock at $62 per share ($13,702) and the debt for which it was pledged to the appellant $6,088, amounting to $7,614, and making with his commission a total of $13,614, as he knew at that time. In the opinion of the Court, the fact that Dunan received a commission of $6,000 for effecting the sale of the Rasin Company's property is treated as immaterial, because that whole amount was applied by him to the payment of a debt owed by him to another person, but he had the same right and power to apply that $6,000 to the Chicora Company's debt as to that of the person who received it. It was available for the payment of *his debts to whomsoever due,* and he could not truly say, as he did say, that he *had nothing* and *could* not make any better settlement than that offered, when the sale thus consummated put him in the possession and control of $6,000 as commissions and $7,614 for appreciation of his 221 shares of the Rasin Company's stock, which were then pledged to the Chicora Company. Dunan himself, testifying in chief, stated that he told Wagener at that time that $9,000 " was the best settlement he could make for some time," when he knew at that time that if the sale was consummated on the 12th of December the pledged stock would thereby become worth more than double the debt due the appellant, and a speedy settlement would follow at 100 cents on the dollar.

On the afternoon of December 5th, at or about 5.20 o'clock, Dunan, being in Baltimore, telegraphed Wagener in New York, that his party accepted the abatement of $2,000, and would make payment December 14th. Whiting testified that on that day, December 5th (at what hour is not stated), he went to Dunan's office and asked him if it were true that the Rasin Fertilizer Company had been bought by the Virginia Carolina Company, and that Dunan said there was not any truth in it; that negotiations had been pending with a Northern syndicate, which if carried out would give the Rasin stockholders very little for their stock, but that on the same day he, Whiting, ascertained that the transaction was a fact and so wrote the appellant. It was true that no completed sale had then been made, but the testimony shows that Dunan knew Whiting's connection with the appellant from the inception of the transaction down to that time, and I cannot regard Dunan's conduct throughout, and his statements both to Wagener and Whiting in any other light than as an effort to suppress all knowledge of the pending sale, and to prevent its disclosure until he could close the negotiations for abatement by his telegraphic acceptance, which followed hard upon the heel of his interview with Whiting.

The nature of the agreement, and the circumstances under which it was made, being those which I have stated, I think a Court of Equity should abstain from its enforcement, and that the appellee should be left to his action at law.

(Filed April 27th, 1900.)