## HERCULES POWDER COMPANY *v.* HARRY T. CAMPBELL SONS COMPANY.

[No. 65, October Term, 1928.]

348

*Decided January 24th, 1929.*
*Judgment modified April 3rd, 1929.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Charles Markell,* with whom were *Joseph L. Donovan* and *J. Howard Murray* on the brief, for the appellant.

*Edward H. Burke,* with whom were *James P. Kelley, James Clark,* and *Bowie & Burke,* on the brief, for the appellee.

Parke. J., delivered the opinion of the Court.

The Hercules Powder Company, appellant, brought suit on the common counts in assumpsit against Harry T. Campbell Sons Company, Inc., appellee, to recover $2,143.79 for dynamite and fuse sold and delivered by it to the defendant. The defendant filed the general issue pleas and a third special plea setting up a counterclaim growing out of damages alleged to have been sustained by the defendant in the use of the dynamite and fuse at its quarry. The court rejected the defendant's only prayer and the first nine of the plaintiff, and granted its tenth prayer, which left the case with the jury on the single instruction that if the jury found for the plaintiff the allowance of interest was discretionary. The verdict of the jury was in favor of the defendant for $22,-602.22, and from the judgment on this verdict the appeal is taken.

The third plea presented the counterclaim by six separate counts. There was a joinder of issue on the general issue pleas, and a replication to the third plea of counterclaim. The defendant demurred to the replication and, after the demurrer had been sustained by the Circuit Court for Baltimore County, the case was removed to Howard County. By leave of the court the defendant filed an amended sixth count in its plea of counterclaim, and the plaintiff re-filed its replication, and the defendant renewed its demurrer, which was

likewise sustained by the Circuit Court for Howard County. So the demurrer to the plaintiff's replication, which mounted to the first error in pleading, can be treated as the pleadings stood after the amendment of the sixth count of the third plea.

The first count in the third plea was on the theory that the plaintiff had sold, and the defendant had bought, the dynamite and fuse upon the express warranty by the plaintiff to the defendant that its dynamite, when placed in holes of a size, number, and location as designated by the plaintiff, and exploded under its direction and control, would blast the rock of the defendant's quarry between a line drawn through the bored holes in which the dynamite would be placed and the face of defendant's quarry and would cause the rock so blasted to be thrown on the floor of the quarry, and to be broken up so that at least eighty *per centum* thereof would be immediately ready for defendant's stone crushers, and that the face of the quarry would be left substantially perpendicular, smooth, and even, and suitable for further quarrying operations; but that, although all conditions had been fulfilled by the defendant when the plaintiff had exploded the dynamite, the result was, without any fault of the defendant, a complete breach of such express warranty, to the great loss and damage of the defendant and its business. The second count is for a similar express warranty, but was based upon a contract to supply dynamite of a quality and quantity to be determined by the plaintiff, and to be exploded by the defendant in existing holes which it had located and had drilled. The third, fourth and fifth counts are based upon slightly variant allegations, from which an implied warranty of like tenor to that set up in the first and second counts is stated to arise. As these three counts were withdrawn before the prayers were granted, there is no necessity to pass upon their legal sufficiency, nor to set forth their differences. The amended sixth count is, also, on the theory of a breach of an implied warranty. After alleging that the defendant was engaged in the operation of a certain quarry and in the sale of its products, and that the plaintiff was a manufacturer and seller of dynamite, explo-

sives, and blasting powder fuses, the sixth count further alleges that the plaintiff, with this knowledge, visited the quarry and proposed to the defendant that the plaintiff would determine and furnish the grade and quantity of each grade of the plaintiff's dynamite that would be required, when placed in certain well-holes to be bored and exploded by the defendant, to blast the rock between a line drawn through said well-holes and the face of the quarry, in consideration of the defendant's promise to pay for the dynamite of such grades and quantities at certain fixed prices, and that the defendant, having no knowledge of the use of dynamite in well-holes, and relying on the knowledge of the plaintiff, entered into a contract for the purchase of the dynamite, that impliedly warranted that dynamite of quality and quantity, as determined and furnished by the plaintiff, when placed in said well-holes and exploded in an ordinarily careful and skillful manner, was reasonably suited to blast the rock between the said line and face of the quarry. The breach alleged is that the plaintiff furnished too much dynamite and dynamite of too great strength was determined and furnished by the plaintiff for the aforesaid purpose, with the result that not only was the stone blasted between the line and the face of the quarry, but the stone was blasted in all directions, and in great masses, causing large crevices in the rocks that remained, destroying a large part of the face of the quarry, and affecting the marketableness of the rock and sand brought down by the blast by mixing with it quantities of red clay which was dislodged by the explosion.

Under these averments it appears that the buyer made known to the seller the particular purpose for which the dynamite was required, and showed that he relied upon the seller's skill in the manufacture of explosives which were bought, so there is an implied condition that the goods furnished should be reasonably fit for the purpose of blasting the stone. Code, art. 83, sec. 36. The fitness of the goods was their quality and capacity, and there is no allegation from which it can be deduced that the goods delivered and used were defective in any respect, or that their effect was

attributable to any other cause than that the buyer left to the seller the duty of "determining" the grade and quantities of each grade of its dynamite required for the specific purpose, and that, in making this determination, the seller specified dynamite in quantities and strength in excess of what proved to be necessary. There is no intimation that the seller acted negligently or wrongfully in making its estimate, so it must be assumed that its conclusion was an honest expression of expert opinion upon the facts available during an inspection of the quarry. Consequently, the result of which the pleader complains is not ascribable to the fitness of the dynamite sold for the purpose in view, but to an error in judgment or opinion, which the buyer must have known was a possibility implicit in the seller's offer and so to be a chance taken by the buyer in accepting the offer, since the seller's determination was necessarily dependent upon the exercise of its judgment and opinion when applied to a problem whose factors could not all be known. The contention of the defendant would enlarge the obligation of an implied warranty of fitness for a particular use, to an assurer of a result which is not imputable to the quality and capacity of the goods sold, but to an error of opinion, which must be taken, under the pleadings, to have been carefully and honestly formed. An express contract would have to be set forth to bind the seller as an assurer, and this the amended sixth count did not do. As the count is bad on this ground, no others need be considered.

The first and second counts of the defendant's third plea are on a contract, with an express warranty, and severally set up a good cause of action, without being bad for duplicity. *Rittenhouse, Winterson Auto Co. v. Kessner*, 129 Md. 102, 104-106. Neither count combines several distinct matters in support of a single demand. 1 *Poe, Pl. & Pr.*, secs. 734, 737.

The plaintiff filed its replication to the several counts of the defendant's plea of counter claim which admits the sale and delivery of certain explosives, and then denies in general terms that the plaintiff had agreed to perform any work or services in connection with the sale or had made any ex-

press or implied warranty whatsoever, but avers that the blasting was done pursuant to a written agreement, which is embodied in the replication and which is here inserted because of its importance:

> "HERCULES POWDER COMPANY,
> "Wilmington, Delaware.
> "Dated 12/22, 1925.

"WHEREAS, The undersigned customer has requested certain assistance of the Hercules Powder Company in connection with the performance of certain blasting operations; and,

"WHEREAS, The Hercules Company is not engaged in blasting work, its business in explosives being confined solely to the manufacture and sale thereof, but to assist said customer the said Hercules Company has agreed to permit said customer the temporary use, free of charge, of the services of said company's employees, together with certain needed equipment, on the express condition that, while engaged in blasting work for the customer, such employees or agents and equipment shall, to all intents and purposes, be the employees and equipment of the undersigned.

"Now, therefore, the undersigned hereby expressly agrees that the employees and equipment of the Hercules Company while engaged or used in said blasting work, are and shall be, to all intents and purposes, the employees and equipment of the undersigned, under his supervision and control and that all services so performed shall be at the sole risk and responsibility of said customer, and, for any damage or loss resulting from such service the Hercules Company shall be held harmless; and further that said Hercules Company does not assume any responsibility for the result of the services of such employees or equipment for which it makes no charge.

> "HARRY T. CAMPBELL SONS CO.,
> "Bruce S. Campbell,
> "Customer."

A demurrer was rightly sustained to this replication. Passing the point that it was a general replication to six different pleas, it amounted to no more than the general issue. The contract set out in the third plea was not a simple sale of goods, but a contract with a warranty, either express or implied. In the form of this replication, the pleader to give color must admit all, not a part, of the contract alleged. Here the replication sets up a denial of the contract averred by the defendant, and presents its own theory of the transaction, which is an argumentative denial of the contract. 1 *Poe, Pl. & Pr.*, secs. 637-641; *Seff v. Brotman*, 108 Md. 278, 284; *Jenkins v. National Bank*, 134 Md. 85, 89; *Citizens' Mut. Fire Ins. Co. v. Conowingo Bridge Co.*, 113 Md. 430, 438.

Before December, 1925, the defendant had operated its quarries by what is known as the "bench method" of blasting, but towards the close of that year its attention was drawn by the Gill Rock Drill Company to a modern, but common, method called "well-drilling." It is unnecessary to describe the two methods, except to say that the method advocated by the drill company was a much more extensive operation than the "bench" method, as it involved the sinking of larger holes to deeper depth, the using of a greater amount of explosives for every blast, and brought down a higher percentage of rock. The advantages were a reduction in drilling for the blasts, in the number of the blasts, and the increase in the result of the blasting operations. It would seem that the customary "well" was a hole with a diameter of six inches, but Fred A. Gill, the representative of the drill company, who was an expert in the art, advocated one of eight inches. Gill had been soliciting a contract to drill holes for the defendant, but the defendant was not persuaded by his efforts. A sales agent of the plaintiff, Stahler, had been calling upon the defendant for some years to sell him "Hercules" powder, but the defendant had not given him an order. This agent and Gill informed the defendant that a blast was to be exploded at Longnecker's quarry, where the eight inch well holes, loaded with "Hercules" powder, would be used, and sug-

gested that its representatives witness the blast. At defendant's request, it was informed of the day and, on October 8th, 1925, the president of the defendant, and its superintendent, went to the quarry and saw the shot. On this occasion, the president and superintendent met Hardesty, a salesman and demonstrator of the plaintiff, and another representative named Peters. Hardesty had made the shot for Longnecker, which was successful, and threw the rock between a line drawn through the well-holes and the face of the quarry, breaking the stone so that about half of it needed no secondary blasting and leaving a new face to the quarry in the plane of the wellholes. After witnessing the blast and observing these results, the defendant's president testified that he requested Hardesty and Peters to come down and look at defendant's quarry, and to tell him if they thought defendant's rock would break in the same manner or better. Peters could not come, but Hardesty promised that he would.

On the 14th of October, Hardesty and Stahler visited the defendant's quarry, and on that occasion the warranties upon which the defendant relies are alleged to have been made. The testimony on the part of the plaintiff contradicts that of the defendant on this issue of fact, and, if believed, amounts to no more than an expression of opinion. However, the plaintiff's witnesses will be ignored, and the testimony on the part of the defendant will be stated. According to the president of the defendant, after he, Hardesty, Stahler, and Gill, who was present, had looked at the quarry face, Hardesty said: "Why, yes, that's more solid in the hill, it will break up better than the Longnecker's did. The Longnecker's was looser in the hill and would come out in bigger chunks, but this was so solid in the hill, with the well holes and the right amount of powder it would come out even better, and as he told me, over 80 per cent. of it. I made the remark that I thought fifty per cent. of Longnecker's would come over— mine would come out better than that, more than eighty per cent. would go through the crusher if the shot was made."

And, further, Hardesty "told me the holes would split right in the center. Mr. Russell of the du Pont Company and Mr.

McKenzie both told me the same thing, that the shot would split the quarry right down and there wouldn't be any back break at all, just cut that down and be able to see, as Mr. Hardesty said, to be able to see the holes the same was as at the Longnecker, see the mark of each hole."

And, finally, "Mr. Hardesty told me it would throw it out flat with the floor by putting the holes five or six feet below the quarry floor, and wouldn't leave any toe at all. As he put it, the button would go out and the top would drop in and be able to see the holes the same as we saw them at Longnecker's, the back of the holes the same as we saw there, split straight down."

These three statements of Hardesty are what the defendant relies upon as constituting an express warranty. They were not so sought and obtained. The defendant, after seeing the blasting and its result at the Longnecker quarry, was doubtful if a similar method of blasting would be equally as effective in its own quarry, owing to a difference in the rock and local conditions. What he desired was the opinion of Hardesty in respect to the suitableness of the method of well-hole blasting under the conditions at the defendant's quarry. This is the way defendant's president put it: "I told Mr. Hardesty I wanted him to come down there and look at it and requested Mr. Peters if he would come too—he was a good deal older man—and if they thought they could break my rock like they did that, or better than that, but if they didn't think that rock would break that way, I didn't want to go into it all all." So, the visit to the defendant's quarry by Hardesty was to get his judgment on the subject of blasting by the well-hole method, and not to secure any warranty as to the fitness or capacity of plaintiff's dynamite. The three quoted statements of Hardesty represent his opinion on that question and none other. The defendant has definitely characterized these declarations of Hardesty to be his desired opinion. At the same time that he gave his judgment that the defendant's quarry would show better results from the well-hole method than were shown at the Longnecker's quarry, Hardesty indicated where, and stated the depth to which, each hole should

be drilled. As a result of this opinion so obtained, the defendant gave the drill company a contract for the drilling of the seven holes, but did not enter into a contract with the plaintiff for the powder. While it is not easy to draw the line accurately between the statement of an opinion on the one hand and an affirmation of fact on the other, and resort to precedents is unsatisfactory because of their conflict and confusion, the facts on this record make clear that the defendant sought and obtained an expression of opinion, not about the goods of the seller, but about introducing a new method of operation of its quarry.

The failure of the defendant to give Hardesty or his company an order for the explosives to be used when the wells were dug was not due to any question of the quality of its explosives, but because the defendant intended "to get the Trojan man and the du Pont man there to see what they thought about it." Its president testified he said to Hardesty: "I told him I wouldn't give him an order because I thought may be Trojan or du Pont would be cheaper and I wanted to get their figures."

Hardesty left and was not again at the quarry and did not see any representative of the defendant until December 22nd, the day of the blast at the quarry. The first well-hole was completed on December 5th and the last on December 16th. The seven were about twenty-eight feet apart, about thirty-two feet from the face of the quarry, and from sixty-seven to seventy-three feet deep. When the representatives of the other two powder companies came, they differed somewhat from Hardesty and from each other in the distance which should be spaced between the holes and from the face of the quarry, and one preferred six-inch well-holes. On account of the better breakage given by Hardesty, the defendant concluded it would be cheaper to buy of the Hercules Powder Company; and the well-holes drilled were as they had been indicated by Hardesty.

When Hardesty returned to his office at Allentown, he wrote the defendant on October 16th, giving the corrected prices of the three grades of powder which he first consid-

ered best for the blasting, and had mentioned to the defendant on his visit to the quarry. In his letter of October 24th to Stahler, Hardesty estimated the quantity of every one of the three grades then specified for the blast; expressed the opinion that "the entire blast should bring down about 35,000 tons of material, which is a little better than four tons per one pound of powder"; and that the defendant "will not attempt to shoot it with any weaker powder than I have recommended." He wrote: "I feel satisfied if any weaker powder is used than seventy-five per cent. in the bottom the stone will not be broken nearly as fine as customer expects it"; and, also, "You might advise Mr. Campbell that it is necessary for him to purchase 8,000 lbs. of the strengths specified above." When Stahler forwarded this letter to defendant on October 26th, in order, as he stated, that the defendant would have explained to him the necessity for using the quantity of dynamite which Hardesty had estimated, Stahler added: "You will notice that Mr. Hardesty is of the same opinion as myself, viz., that weaker powder will not do the work."

After this letter, nothing appears to have been done until December 9th, 1925, when defendant gave an order through Stahler for the powder, stating: "These amounts are taken from the letter that you received from Mr. Hardesty and forwarded to us. If these amounts are not correct, let us know at once." Aside from the direction to ship the powder and the expression of the hope that Stahler would be present on the day of the blast, the letter contained this paragraph: "It is our understanding that you are to have Mr. Hardesty here to make this shot as soon after the holes are drilled as possible."

When the order was received it was for 3,000 pounds of seventy-five per cent. gelatin; 2,000 pounds of sixty per cent. gelatin, and 3,000 pounds of forty per cent. Extra L. F., but Hardesty telephoned the defendant that he was making it all of the two higher grades, and the defendant's president testified he replied as follows: "Well, you are all doing this, and you have changed two or three times. It's all your job. You

go ahead and send whatever you want, send it down. He said, "All right"; and on the following day I wired him to ship as soon as possible. We had finished drilling and as soon as we finished drilling I wanted him to shoot it as soon as possible."

Accordingly, plaintiff shipped on December 18th, 5,000 pounds of seventy-five per cent. gelatin and 5,000 pounds of sixty per cent. gelatin, and a few days later the necessary fuse; and on December 22nd the well-holes were loaded and the blast made.

The defendant does not rest its theory of an express warranty upon the letters, and there is no reason why it should, as none of them does more than express the opinion of the writer, and all tend to fortify the conclusion that there is no evidence on this record of any affirmation of fact by the seller relating to the quality of the goods that the plaintiff was selling. Nor is there any question of implied warranty, since the goods sold by the manufacturer were reasonably fit for the purpose for which they were to be used by the buyer. The record does not ascribe the injuries of which the defendant complains to the absence, failure, or loss of any quality or capacity which the dynamite should have possessed at the time of its sale for the purpose for which it was bought. On the contrary, the injury resulted from methods and conditions which were extraneous to the quality of the goods sold. However, the statutory definition of an express warranty includes any promise of the seller relating to the goods, and, as observed by Williston, a party may bind himself by contract for the happening of a future event. 1 *Williston on Sales* (2nd Ed.), sec. 212. So, the conclusion that the seller made no affirmation of fact does not determine the connected and remaining inquiry, if these oral and written statements, when taken in connection with the circumstances, did not tend to establish an actual promise on the part of the seller that under given conditions a certain desired result would be produced by the use, in a particular manner, of the goods sold.

It is our judgment that the ignorance of the defendant of

the method of blasting about to be tried, and the defendant's reliance upon the expert skill and knowledge of the plaintiff in the science of explosives and the art of blasting, as applied to the particular problem and purpose of the defendant, when taken in connection with the plaintiff's information of what the defendant expected the blasting to accomplish, the negotiations between the parties, and the circumstances of the sale before the day of the blasting, are sufficient to give rise to a promise on the part of the seller that, if the well-holes, when in a suitable condition for blasting, were loaded with sufficient powder, in the order of their relative strength and in proper proportion, the blast would produce the desired fall and breaking of the rock, and leave a solid new face to the quarry. Whether the sum of all these facts and circumstances would have amounted to a promise, or were merely an expression of opinion, would have been for the finding of the jury, if it had not been for what was agreed to on the day the blasting was done.

What occurred on that day was due to this statement in defendant's order: "It is our understanding that you are to have Mr. Hardesty here to make this shot as soon after the holes are drilled as possible." This sentence is ambiguous and indefinite. The order was not made conditional on Hardesty's "making the shot," nor did it afford any test of what Hardesty was to do, nor in what capacity he would act. In the first place, "to make this shot" could mean either exploding the holes already loaded by the defendant, or loading each well-hole with its proper charge of dynamite and then setting off the blast. In the next place, Hardesty could act in this service either as the servant of the plaintiff or of the defendant, *pro hac vice*. The plaintiff was in the business of manufacturing and selling explosives; and the defendant was engaged in the operation of a quarry, and in this operation bought explosives and blasted the rock in its quarry. If Hardesty was to participate in the blasting at the quarry, it was important for his status, while so employed, to be fixed beyond any question.

So, we find the plaintiff sending Hardesty and Barab, an engineer and expert in explosives, to the quarry of the defendant on the day fixed for the explosion. When they arrived the president of the defendant was sent for, and Hardesty informed him that he would not assume control and supervision of charging the well-holes and setting off the blast until and unless the defendant would enter into the agreement, dated December 22nd, 1925, which has been set out in full in the plaintiff's replication. The defendant, at first, declined, but, after being told that the dynamite would not be taken back, and considering the matter for about an hour, executed and delivered this document, which interpreted the clause in defendant's order to be a request of the plaintiff for assistance in connection with the performance of certain blasting operations, which the plaintiff agreed to give by permitting its customer the temporary use, free of charge, of the services of the plaintiff's employees, on the express condition that, while engaged in blasting work, for the customer, the plaintiff's employees or agents shall, to all intents and purposes, be the employees of the defendant. By this paper-writing the defendant expressly agreed that the employees and equipment of the plaintiff, while engaged or used in the blasting work, are and shall be, to all intents and purposes, the employees and equipment of the defendant, under its supervision and control; and that all services so performed shall be at the sole risk and responsibility of the defendant, and for any damage or loss resulting from such service the plaintiff shall be held harmless; and, finally, that said plaintiff does not assume any responsibility for the result of the services of such employees or equipment. In short, the parties agreed in writing what was meant by the ambiguous sentence in defendant's order in reference to Hardesty's being present "to make this shot" and to the conditions of the service to be performed. The effect of this agreement was to substitute the document of December 22nd for all prior inconsistent oral and written terms of the contract; and the rights and obligations of the parties with respect to the blasting were governed and determined by this written agreement.

362

As has been said, "a subsequent contract completely covering the same subject matter, and made by the same parties, as an earlier agreement, but containing terms inconsistent with the former contract, so that the two cannot stand together, rescinds, substitutes, and is substituted for the earlier contract and becomes the only agreement of the parties on the subject." *Williston's Wald's Pollock on Contracts* (3rd Ed.) 816. See note 25 for cases. If a contract is not within the Statute of Frauds, nor under seal, there is upon principle no reason why parties to an executory contract, who discover that it does not correctly express their agreement, or differ as to its meaning, may not change the agreement by mutual consent, so as to make it conform either to the actual agreement between the parties, or to the agreement reached as a compromise of their differences arising out of the original contract. In the latter case, a compromise of the differences between the parties, and the mutual agreement to rescind the old contract and to enter into a new contract embodying the compromise, are sufficient consideration to support the new contract. *Brantly on Contracts* (2nd Ed.) 107, 391; *Spalding v. Conant,* 146 Mass. 292; *Dreifus v. Salvage Co.,* 194 Pa. 475; 1 *Williston on Sales* (2nd Ed.), sec. 118; *Benjamin on Sales* (5th Ed.) 238; *L. R. A.* 1915B, 1-70. Moreover, it was long since said that "the same consideration which existed for the old agreement is imported into the new agreement which is substituted for it." *Stead v. Dawler,* 10 Ad. & El. 57, 66, 113 Eng. Rep. 22, 26.

In the case of *Pearl Hominy Co. v. Linthicum,* 112 Md. 27, 34, it was said: In *Allen v. Sowerby,* 37 Md. 410, Judge Stewart, after stating the rule that "parol contemporaneous testimony is inadmissible to contradict or vary the terms of a valid written instrument," says "without doing violence to this long established and useful rule of evidence, it has been held competent to prove by parol a distinct subsequent agreement, waiving, abandoning or modifying the terms of the writing, or to prove an additional supplementary agreement by parol, by which something is supplied, that is not in the written contract." *Coates & Glenn v. Sangston,* 5 Md. 121,

131; *Atwell & Appleton v. Miller,* 11 Md. 348, 360, 361; *Kribs v. Jones & Son,* 44 Md. 396, 408; *Brooks v. Waring,* 7 Gill, 5, 8; *Abrams v. Eckenrode,* 136 Md. 244, 248; *Fusting v. Sullivan,* 41 Md. 162, 170; *Walter v. Bloede Co.,* 94 Md. 80, 85; *Furness, Withy & Co. v. Randall,* 124 Md. 101, 106. See *Linz v. Schuck,* 106 Md. 220, 230, 235; *Dixon v. Fowler,* 114 Md. 344. But compare 1 *Williston on Contracts,* secs. 130, 130a.

The contention of the defendant is that the supplementary agreement in writing of December 22nd is invalid, because it is not supported by a sufficient consideration. The defendant argues that neither the promise of the plaintiff in the agreement of December 22nd, nor the actual performance of that promise, was a good consideration, since it was a promise to do, or the performance of, no more than the plaintiff was already bound to do under the subsisting contract. The defendant misconceives the nature and effect of the agreement, which was executed before a breach, but after it had developed that the parties differed with respect to their several obligations and liabilities. The written order of the defendant contained terms which were susceptible of different meanings, and were to be taken most strongly against the defendant which used them (*Varnum & Aspinwall v. Thurston,* 17 Md. 471); and, also, failed to express the obligations which the defendant asserted and the plaintiff denied were imposed by the contract upon the plaintiff. The contract effected by the defendant's order, and the agreement of December 22nd, make it unnecessary to labor the point that there was a genuine and substantial dispute between the parties, not only with respect to the real terms of the contract, but also with reference to the meaning of the expression that Hardesty was to be present "to make this shot."

Moreover, the contract was executory on the part of both the promisor and the promisee. The seller had delivered the goods and had Hardesty present but whatever Hardesty was to do remained undone; and, while the buyer had accepted the goods, the payment therefor had not been made. So, neither party had completely performed or been discharged from the

obligation of the contract, and what Hardesty was to do and in what capacity and at whose expense remained indefinite. The parties did not rescind the original contract, but agreed to supplement it by a writing which made certain their obligations under those terms whose significance was doubtful and which, also, expressed their agreement on matters upon which their minds had not previously met. As a result of this supplementary agreement, the obligation of the seller with respect to the blasting became certain for the first time. In addition, the seller promised to give to the buyer the services of its employees to assist in the blasting work, and to do so without any charge to the seller. Instead of one of its employees, the seller supplied not only Hardesty, but another expert, who was his superior in skill and experience; and these two took control of the work of blasting and determined the quantity of each grade of dynamite used, and the manner and proportions in which it should be placed and loaded in every one of the seven well-holes, and how it should be exploded, and then set off the blast. This was doing something different and more than the seller had agreed to do in the original contract. It furnished the buyer with the technical knowledge and practical skill of two of its employees in everything that related to the loading of the well-holes and the making of the blast, without any charge for the benefits of their expert qualifications and services. So, it is not a case of the seller doing exactly what he had previously bound himself to do, but one where a term, which was too indefinite to make certain its obligations or how it was to be performed, is replaced by a definite undertaking to be performed by the seller's employees of its own selection, without compensation, in consideration of the buyer agreeing to assume (a) the temporary relation of master to the seller's employees, who were to supply the skilled assistance desired, and (b) all risk of damage and loss which might result from their services. Here was a new promise involving a detriment to the seller, and conferring a benefit upon the buyer to which it was not previously entitled.

A sufficient consideration, therefore, existed in this bilateral contract, for "mutual promises in each of which the promisor undertakes some act or forbearance that will be, or apparently may be detrimental to the promisor or beneficial to the promisee, and neither of which is rendered void by any rule of law other than that relating to consideration, are sufficient consideration for one another." 1 *Williston on Contracts,* sec. 103 f. The undertaking or doing of anything beyond what one is already bound to do, though of the same kind and in the same transaction, is a good consideration. *Williston's Wald's Pollock on Contracts* (3rd Ed.), 203, 204.

Whether the consideration was adequate is, in the absence of fraud, a matter wholly for the parties to the contract. The rule is thus stated by Williston: "It is an elementary principle that the law will not enter into an inquiry as to the adequacy of the consideration. This rule is almost as old as the law of consideration itself. Therefore, anything which fulfills the requirement of consideration will support a promise whatever may be the comparative value of the consideration, and of the thing promised." 1 *Williston on Contracts,* sec. 115; *Taylor v. Turley,* 33 Md. 500, 505, 506; *Haines v. Haines,* 6 Md. 435, 439, 440; *Lanahan v. Heaver,* 77 Md. 605, 609; *Chicora Fertilizer Co. v. Duncan,* 91 Md. 144, 156.

So, whether the writing of December 22nd be considered as suppletory to the original contract and forming a complementary part thereof, or as a substituted contract, a sufficient consideration exists, upon either theory, to support the new agreement. Having entered into the agreement voluntarily, the defendant is bound by its stipulations. *Dixon & Treadwell v. Fowler,* 114 Md. 344, 353, 358; *Atwell & Appleton v. Miller,* 11 Md. 348, 358, 360, 361.

The case of *Kribs v. Jones & Son,* 44 Md. 396, has strong analogy to the one at bar. In that case there was a contract in writing for the sale of apples, whereby the seller would have performed his contract by delivering the apples to a carrier in a merchantable condition and taking the usual precautions to ensure their safe delivery to the buyers. It was contended that subsequently, and while the contract was

executory, the parties agreed that the apples should be consigned to a third party, who would deliver the bills of lading to the buyers when they would pay the stipulated price to the third party. The effect of this oral modification was materially to alter the terms of the written contract, since by it the delivery to the carrier was a delivery to the buyer, who would assume the risk of carriage; but, by the substituted terms, the third party was the agent of the seller and so, a delivery to the carrier was as the agent of the seller, and the risks of the carriage would be assumed by the seller. As a part of the apples had been delivered to the buyer, the oral agreement was not within the Statute of Frauds, and the court held that, on a proper state of pleadings, the parol evidence would be admissible to prove that the original contract, though in writing, had been afterwards modified or changed by a supplementary verbal agreement. pp. 406-408. Similarly, in the pending appeal, if the paper writing had not been executed, the employees of the seller would have been its servants in the loading and shooting of the blast, and the seller would have assumed the risk of their acts; but, by virtue of the execution of the written agreement, the employees of the seller became the servants *pro hac vice* of the buyer, which, under the express provisions of the instrument, assumed all risks of the blasting. *Atwell & Appleton v. Miller*, 11 Md. 348, 360, 361.

Barab and Hardesty had not seen the well-holes before December 22nd, but they were informed, when they arrived, according to the defendant's testimony, that the drilling of the wells had revealed sand seams in what apparently was a homogeneous mass of stone, yet they made no effort to correct this condition. After an inspection of the holes, it was the duty of Barab and Hardesty to determine, in the light of the situation as it was then known or ascertainable by them, whether the dynamite on hand was of the proper grades to accomplish the object of the blasting; and, if this preliminary decision were in the affirmative, then to determine the quantities of each grade for every well-hole; to prepare the charges and to determine the manner of loading the holes,

and, finally, to shoot the blast. The drilling of well-holes for blasting is a common and successful method, and it is the theory of the defendant that if less dynamite, or of a lower strength, had been used, and reasonable care and skill had been employed in the preparation and loading of the well-holes, the explosion would not have resulted in an injury to the quarry. Since this was the risk the defendant assumed in agreeing that Barab and Hardesty were its servants, and that it would accept the responsibility for their judgment and actions while in this service, the defendant's counterclaim must fail. The trial court was, therefore, in error in not granting the plaintiff's prayer withdrawing the counterclaim from the consideration of the jury. *Salowitch v. Kres,* 147 Md. 23, 30-34.

The effect of the agreement of December 22nd makes it unnecessary for the court to pass upon the exceptions arising on the rulings on the evidence. For its error in not withdrawing the defense of counterclaim from the jury the judgment of the court must be reversed; and, as the material facts with respect to the sale and delivery and value of the dynamite are not disputed, a judgment would be entered for the plaintiff for this amount, since the plaintiff has expressed a willingness to waive a demand for interest, if it were not for the further fact that the claim sued on included a small charge for fuse, whose value is not shown by the evidence. On this account the case will have to be remanded for a new trial. *Balto. & O. R. Co. v. Reuter,* 114 Md. 700.

> *Judgment reversed, with costs, and case remanded for a new trial.*

On motion for modification.

Since the filing of the opinion, the plaintiff has removed the single reason for remanding the case for a new trial by formally waiving in this court any claim for the fuses sold and delivered to the defendant. So, as there does not appear to be any sufficient reason for granting defendant's motion

for a re-argument, the court will modify its order by directing that a judgment be entered in favor of the plaintiff. Code, art. 5, secs. 17, 25; *Benzinger v. Gies,* 87 Md. 704, 709; *Roberts & Co. v. Robinson,* 141 Md. 37, 54, 55; *McCormick v. Deaver,* 22 Md. 195; *Bucher v. Federal Baseball Club,* 130 Md. 644; *Middendorf etc. Co. v. Milburn Co.,* 137 Md. 600; *Strathmore Coal Mining Co. v. Bayard Coal & Coke Co.,* 139 Md. 355, 375.

The judgment of this court as announced on January 24th, 1929, is hereby modified, and judgment is reversed with costs, and judgment is entered in favor of the appellant, Hercules Powder Company, against the appellee, Harry T. Campbell Sons Company, Inc., for the sum of $2,100, with interest from the date of the rendition of the judgment and costs.

OFFUTT, J., dissents.