## BLUMENTHAL *v*. HERON ET AL.

[No. 342, September Term, 1970.]

*Decided March 5, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Jeffrey R. Schmieler* for appellant.

*Leonard M. Murphy,* with whom were *Meatyard, Carlin & Hollis* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The Circuit Court for Montgomery County (Joseph M. Mathias, J.), sitting without a jury, entered a judgment for $1,936.54 and costs against the appellant, Harvey Blumenthal, the defendant below, in favor of the plaintiffs below, Alexander M. Heron and Julian B. Heron, appellees in this Court. The principal issues before us are (1) in regard to the sufficiency of the evidence to justify the trial court's finding of an oral promise by Blumenthal to satisfy a judgment in favor of the appellees against the M.Q.F. Corporation (MQF); (2) whether the oral promise is unenforceable because of the provisions of Sec. IV (2) of the Statute of Frauds; (3) the alleged failure of the contract (a) for want of consideration and (b) its alleged obtention by economic duress.

On August 8, 1968, the appellees obtained a judgment in the Circuit Court for Montgomery County for $2,350.-00 and costs against MQF. The appellees, on March 13, 1969, directed the Sheriff of Montgomery County and his deputies to proceed under a writ of *fieri facias* to levy on certain laundry and dry cleaning coin boxes at stores in Silver Spring Norge Village and Bethesda Norge Village, which the appellees believed were owned by MQF.

During the course of the levy, the Deputy Sheriff seized one coin box at the Silver Spring Norge Village store which contained $97.00 in cash. Blumenthal, who was then at his retail liquor store at 5544 Connecticut Ave-

nue, N.W., in the District of Columbia (he had been in the retail liquor business for 26 years), was telephoned by the manager of the Silver Spring and Bethesda stores that the levy had been made on the equipment. Blumenthal then telephoned Charles W. Foster, Esquire, counsel for the appellees, and inquired if there was anything that could be done to stop the levy. Mr. Blumenthal stated, according to Mr. Foster, that "he was in the process of selling these businesses and that further proceedings would delay or completely ruin the sale." Mr. Foster informed Mr. Blumenthal that he had his instructions from his client, Alexander M. Heron, Esquire, a member of the Bars of the District of Columbia and of Maryland and who had practiced in both jurisdictions for some 42 years (principally in the District of Columbia), and would have to have additional instructions from Mr. Heron if the attachments were to be stopped. Mr. Foster suggested that Mr. Blumenthal communicate directly with Mr. Heron, which Mr. Blumenthal forthwith did by telephone. Mr. Heron and Mr. Blumenthal differ in regard to what was said during their telephone conversations.

Mr. Heron was not in his office at the time of Mr. Blumenthal's telephone call. When he returned to his office, there was a message to call Mr. Blumenthal and he did. Mr. Heron testified that he was informed by Mr. Blumenthal that, "Deputy Sheriffs had levied attachments in the two places which were operated by the M.Q.F. Corporation." He stated that Mr. Blumenthal then said that:

> ". . .he was in the course of negotiations which he hoped would enable him to retrieve or recover his investment in that corporation and that the effect of the attachments would probably be to defeat or cause those negotiations to fail. He was quite anxious that the attachments be lifted."

The telephone conversation then continued:

> "I [Heron] asked him [Blumenthal] to call

Mr. Foster, and he said that he'd already called Mr. Foster but he would do nothing about the attachments without my direction.

"Mr. Blumenthal then proposed that the judgment be paid at the rate of a hundred dollars a week and that he would be responsible to see that the payments were made. He said that he thought that the earnings of the company would be sufficient to justify the payment of a hundred dollars a week.

"I told him that I would do nothing about it until I'd first consulted with Mr. Foster.

"I called Mr. Foster and talked with him and then, somewhat later, I called Mr. Blumenthal back and told him that upon the understanding that he would be personally responsible for the payment of the judgment and would stand behind the hundred-dollar payments we would go ahead and accept payment on that basis and have the sheriffs withdraw and the attachment proceeding withdrawn."

Mr. Blumenthal then indicated that he had an investment in MQF. Blumenthal during a later telephone conversation with Heron proposed that $100.00 a week be paid to liquidate the judgment debt. Heron "stated to him that this would be upon the understanding that he would be personally responsible for the payment of the judgment. And he acquiesced in that."

Mr. Blumenthal, on the other hand, testified that he did not promise to be personally liable for the payment of the judgment debt. He stated that he told Mr. Heron that he believed that "the business could handle a hundred dollars a week approximately out of proceeds," that is "out of the moneys taken in out of the operation." He further testified that he owned one-third of the stock in MQF, which, however, had had its charter forfeited for non-payment of taxes [articles of revival had been prepared but not filed] and that Blumenthal's interest "was

simply to do what could be done to protect the liability that I had on the Central Leasing leases" [the corporation that had leased the laundry equipment to Blumenthal].

In any event, four payments of $100.00 each were paid at Mr. Foster's office for the account of the appellees. Mr. Foster testified on cross-examination that his secretary had indicated to him that Mr. Blumenthal had personally come to the office to make payments. Mr. Blumenthal denies that he personally went to Mr. Foster's office, but that it was possibly a Mr. Womple, operator of the business, or one of the employees of the business.

The trial court resolved the conflict in the testimony in favor of the appellees and, as indicated, entered judgment in their favor for $1,936.54 and costs, the amount of the MQF judgment of $2,350.00 plus court costs of $98.30, a total of $2,448.30 less credits of $511.76.

### (1)

Pursuant to Maryland Rule 886 we will review both the law and the evidence in an action tried by the lower court without a jury but the judgment of the lower court "will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses."

We have set out in some detail the conflicting evidence of the parties and need not repeat it here. Judge Mathias in considering this aspect of the case, stated in his written opinion:

"We are called upon to decide as between two witnesses whose testimony is the more credible. We are mindful, of course, that the burden of proof is on the plaintiffs and that to meet this burden their evidence must be the more convincing and carry the most weight. We have had the opportunity to observe the demeanor of the witnesses and to judge their credibility, not only on

the basis of what they said but also on their manner of saying it. We are entitled to consider the plausibility of the witnesses' testimony and whether or not they might have reason for not telling the truth. We are entitled to believe all, part or none of the testimony of either witness. After fully considering all the facts and circumstances we find the defendant's testimony to be implausible. We accept the testimony of the plaintiff, Alexander Heron, and find the defendant did make an oral promise to pay the debt of the corporation, in which we find he had a substantial interest."

We think it is apparent that we should not say that the lower court's finding was clearly erroneous.

### (2)

By Section IV, Subsection 2 of the Statute of Frauds, 29 Car. 2, Cap. 3 effective in 1677 and still in force in Maryland, see 2 Alexander's "British Statutes in Force in Maryland," (Coe's ed.), p. 690, no action shall be brought "whereby to charge the Defendant upon any special Promise to answer for the Debt, Default or Miscarriages of another Person * * * unless the Agreement upon which such Action shall be brought, or some *Memorandum* or Note thereof, shall be in Writing, and signed by the Party to be charged therewith, or some other Person thereunto by him lawfully authorized."

Blumenthal contends that the oral promise in the present case cannot be enforced because of the provisions of Section IV (2). We do not agree with this contention.

In the construction of Section IV (2), it is well settled in Maryland, as elsewhere, that if the oral promise is made by the promisor to serve some purpose of his own rather than to answer for the debt of another person, the oral promise is not within Section IV (2). We reviewed the Maryland Law in this regard in *Kline v. Lightman*, 243 Md. 460, 472-73, 221 A. 2d 675 (1966), as follows:

"It is equally well settled in Maryland and by the great weight of authority generally that if the oral promise is to be made by the defendant to serve some purpose *of his own* rather than to answer for the debt, default or miscarriage *of another person,* such an oral promise is not within Section IV, Subsection (2) of the Statute of Frauds. Judge Delaplaine, for the Court, in *Crown Realty Corporation v. Weinstein,* 177 Md. 260, 9 A. 2d 602 (1939) stated the 'main purpose' or 'leading purpose' rule as follows:

" 'The question in this case is whether the alleged promise of the appellant was collateral, and therefore within the Statute of Frauds, or whether it was original and enforceable. It is frequently difficult to determine, merely from the words in which a promise has been made, whether the undertaking is collateral to an engagement of liability or an original undertaking. In deciding this question, the situation of the parties and all the surrounding circumstances should be considered. In other words, the test in determining whether an undertaking is collateral or original is whether the promise was in fact made and intended as collateral or as original. 27 *C.J., Statute of Frauds,* sec. 20; *Brantly on Contracts,* sec. 55.

" 'It is well established that whenever the main purpose of the promisor is to subserve some pecuniary or business purpose of his own, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing that liability. *Elder v. Warfield,* 7 H. & J. 391; *Small v. Schaefer,* 24 Md. 143; *Davis v. Patrick,* 141 U. S. 479, 12 S. Ct. 58,

35 L. Ed. 826. Thus, where there is a new and superadded consideration for the promise, moving between the party promising and the party to whom the promise is made, and distinct from the original liability, the promise is original.' (Page 263 of 177 Md.; page 603 of 9 A. 2d).

"See also *Mangione v. Braverman, supra,* at page 361 of 234 Md. and page 227 of 199 A. 2d."

In our opinion, the lower court correctly concluded that the "main purpose" or "leading purpose" rule applied and that the oral promise was not within Section IV (2) of the Statute of Frauds. Mr. Heron testified that Mr. Blumenthal stated that he had a sale for the business which would be ruined if the attachment continued. Indeed, Mr. Blumenthal, himself, testified that he was interested in protecting his personal obligation on the leases of the equipment used in the business. Mr. Blumenthal's oral promise was to serve *his own* purposes and was not to answer for the debt of *another, i.e.,* MQF.

### (3a)

Blumenthal next contends that the oral contract cannot be enforced because it is unsupported by sufficient consideration. He argues that MQF had no interest in the property upon which the attachment was being laid and hence the appellees were legally entitled to nothing and no benefit accrued to Blumenthal from the oral promise. Again, we do not agree with this contention.

In the first place, Blumenthal admittedly received back the $97.00 which had been seized by the Deputy Sheriff as a result of the making of the oral promise. This is a small amount, but it is well settled that the Courts of Law, in the absence of fraud, will not inquire into the adequacy of the value exacted for the promise so long as it has some value.

As Judge Parke, for the Court, aptly stated in *Hercules Powder Co. v. Harry T. Campbell Sons Co.,* 156 Md. 346, 365, 144 A. 510, 62 A.L.R. 1497 (1929):

"Whether the consideration was adequate is, in the absence of fraud, a matter wholly for the parties to the contract. The rule is thus stated by Williston: 'It is an elementary principle that the law will not enter into an inquiry as to the adequacy of the consideration. This rule is almost as old as the law of consideration itself. Therefore, anything which fulfills the requirement of consideration will support a promise whatever may be the comparative value of the consideration, and of the thing promised.' 1 *Williston on Contracts*, sec. 115; *Taylor v. Turley*, 33 Md. 500, 505, 506; *Haines v. Haines*, 6 Md. 435, 439, 440; *Lanahan v. Heaver*, 77 Md. 605, 609; *Chicora Fertilizer Co. v. Duncan*, 91 Md. 144, 156."

See also *Shriver v. Druid Realty Co.*, 149 Md. 385, 390-394, 131 A. 815 (1926).

Secondly—and more importantly—there is, in our opinion, sufficient consideration by the forbearance of continuing the attachment to support the oral promise.

As Judge (now Chief Judge) Hammond stated for the Court in *Board of County Commissioners of Harford County v. MacPhail*, 214 Md. 192, 197-98, 133 A. 2d 96 (1957):

"It is well established that forbearance to sue for a lawful claim and demand is good consideration if the one forbearing honestly intended to prosecute litigation which is not frivolous, vexatious or unlawful (that is, litigation that has a reasonable basis) and which he believes to be well founded even though it may in fact be unfounded. *Snyder v. Cearfoss*, 187 Md. 635, 643; *Fiege v. Boehm*, 210 Md. 352, 360-1; *Hoffman v. Seth*, 207 Md. 234, 241; *Kolker v. Gorn*, 202 Md. 322."

The testimony of Mr. Foster indicated that the appel-

lees believed that MQF owned and operated the personal property which the Deputy Sheriffs were directed to attach. There is no suggestion in the evidence that the attachment was frivolous or vexatious or that it did not have a reasonable basis which the appellees believed to be well founded. Mr. Blumenthal did not raise any question about the *validity* of the attachment in his various telephone conversations on March 13, 1969. In our opinion the forbearance of the appellees in going forward with the attachments was sufficient consideration to support the oral promise of Mr. Blumenthal.

(3b)

Finally, the appellant Blumenthal argues that the oral contract should not be enforced because it was obtained by "economic duress," or "business compulsion," in that a failure by Mr. Blumenthal to stop the attachment "could have had the disastrous effect of ruining the contemplated sale of the business."

The short answer to this contention is that we considered the doctrine of "economic duress" in *Montauk Corp. v. Seeds,* 215 Md. 491, 501-02, 138 A. 2d 907 (1958).

Judge (later Chief Judge) Prescott, for the Court, stated:

> "The appellant further argues that the trial court erred in refusing to permit it to present evidence of 'economic and financial duress resulting from its negotiations with the Commission.' It maintains that it was entitled to introduce such evidence under the doctrine of 'business compulsion.' Even after a careful reading of the appellant's brief, it is difficult to discern, with certainty, just what this contention is. The only authority to which the appellant refers is an annotation in 79 A.L.R. 657, but the doctrine mentioned is dealt with in 5 *Williston, Contracts,* secs. 1608, 1618, and elsewhere. A succinct statement of the principle is contained in 79 A.L.R.

658, which briefs the opinion in *Illinois Merchants Tr. Co. v. Harvey* (Ill.), 167 N. E. 69, wherein it is said:

> " 'The ancient doctrine of duress of person (later of goods) has been relaxed and extended so as to admit of compulsion of business and circumstances; and the rule deducible from the authorities is that where one, to prevent injury to his person, business, or property, is compelled to make payment of money which the party demanding has no right to receive, and no adequate opportunity is afforded the payer effectively to resist such payment, it is made under duress and can be recovered.'

"It seems clear that this rule has no application to the facts in the case under consideration. Here, the appellant was not the plaintiff below endeavoring to recover money wrongfully required to be paid to another, nor was there any claim that the contract sued upon in this case was procured by duress. If it be the contention of the appellant that its contract with the Commission was brought about by 'business compulsion,' which, as a matter of law, excused its nonperformance of its obligation to Seeds, no authority is cited to sustain such a proposition, and it is doubted that any can be found."

In the present case there obviously is no duress in obtaining the oral promise which resulted from telephone conversations initiated by Blumenthal to seek to protect his own interests. Nor is there any evidence that Blumenthal is an impecunious person being "pressed to the wall," as it were. The evidence in the record rather suggests the contrary.

*Judgment affirmed, the appellant to pay the costs.*