17 F.3d 1433
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Michael R. BARNES, Matthew D. Church, Plaintiffs-Appellees,
v.
HYBRID SYSTEMS, INCORPORATED; Gary J. Murphy, Defendants-Appellants.
 Nos. 93-1246, 93-1319.
 United States Court of Appeals, Fourth Circuit.
 Argued Sept. 29, 1993.
Decided Feb. 17, 1994.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore. M. J. Garbis, District Judge. (CA-91-3132-MJG)
 Lawrence Jay Gebhardt, Gebhardt & Smith, Baltimore, MD, for appellants.
 G. Randall Whittenberger, Miles & Stockbridge, Frederick, MD, for appellees.
 Matthew E. Kiely, Gebhardt & Smith, Baltimore, MD, for appellants.
 D.Md.
 AFFIRMED IN PART, MODIFIED IN PART, AND REMANDED.
 Before ERVIN, Chief Judge, and MURNAGHAN and WILKINS, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 These cross-appeals involve two written agreements executed by Gary Murphy, the president of Hybrid Systems, Inc. ("Hybrid"), wherein he agreed to pay Michael Barnes and Matthew Church, two departing employees who held stock in Hybrid, $5.00 per share plus the difference in price should Hybrid stock sell for a higher price within the following year. The trial court denied Hybrid's motion for summary judgment on the issue of whether these agreements were unenforceable for lack of consideration. Finding that these agreements constituted binding contractual obligations, the district court granted an oral motion for partial summary judgment in favor of Barnes and Church on the issue. The interpretation of the guarantees and the determination of whether later transactions within the one year period constituted stock sales triggering the guarantees were left to the jury, which unanimously found that Hybrid sold stock for $300.00 per share within the one-year period covered by the guarantees. Following trial, the district court, acting by stipulation of the parties, determined that prejudgment interest would be paid at a rate of 6% for 14 months.
 
 
 2
 Hybrid and Murphy appeal the final judgment, arguing that the guarantee agreements were unenforceable for lack of consideration. Barnes and Church cross-appeal on the issue of the proper prejudgment interest period, contending that 30 months rather than 14 months is the appropriate term. Concluding that summary judgment was proper, we affirm the district court's finding that the guarantee agreements constituted binding contractual obligations. We remand the case to the district court with instructions to modify its Order on the issue of prejudgment interest, and award 30 months rather than 14 months of prejudgment interest.
 
 I.
 
 3
 Hybrid was a manufacturer and exporter of optical character reader machines, components, and transport systems.[1] Gary Murphy was the founder, president and majority shareholder of Hybrid.
 
 
 4
 In 1987, Murphy hired Michael Barnes to work at Hybrid as a mechanical engineer, and Matthew Church to work as a production manager. As part of their initial employment packages, Barnes and Church received 300 and 100 shares respectively of Hybrid stock. The stock certificates issued to them contained a legend restricting the transferability of the stock as provided by Hybrid's bylaws, Article V, Section 8, which simply gave Hybrid thirty days' first refusal rights to repurchase the stock, but made no mention of how the stock's resale value was to be determined.
 
 
 5
 Before beginning work, Murphy wrote Church an offer letter that stated:
 
 
 6
 We will grant you 100 shares of Hybrid stock with the condition that it be sold back to Hybrid for equity value if you leave for any reason. This grant has a value of $950.00 which will be added to your W2 for 1987. In April 1988, Barnes received a bonus of 50 additional shares, and in October 1988, Church received 50 bonus shares. In October 1988, all employees of Hybrid who owned stock in the company were required to execute stock repurchase agreements, which stated as follows:
 
 
 7
 It is agreed that so long as Hybrid Systems, Inc. is a private company that the stock received from Hybrid Systems, Inc. must be sold back to Hybrid Systems for its equity value at the time that I should leave the employment of the company for any reason whatsoever.
 
 
 8
 (Emphasis added).
 
 
 9
 Hybrid's stock split in April 1989, and all employee stockholders were allowed to purchase additional shares of Hybrid stock in order to maintain their ownership percentages in the company. Barnes purchased 350 shares for a total of 700 shares, and Church purchased an additional 150 shares for a total of 300 shares. At this time, all employee stockholders re-executed stock repurchase agreements.
 
 
 10
 Alleging that Hybrid was failing financially, Murphy decided in 1989 to move Hybrid from Frederick County, Maryland, to Birmingham, Alabama, where operating costs would be lower. Murphy claims that Hybrid was insolvent at the time, so that the "equity value" of each share was zero. He nonetheless offered to repurchase the stock of all employees who elected not to relocate to Alabama for $5.00 per share.
 
 
 11
 Church elected not to relocate to Alabama, and on January 4, 1990, Murphy and Church met to discuss matters relating to the termination of Church's employment with Hybrid. In the process of settling their respective differences, Murphy and Church negotiated a schedule whereby Murphy and Hybrid would pay deferred compensation, vacation and sick leave pay owed to Church over a period of time, with interest thereon.
 
 
 12
 During the course of this meeting, Murphy asked Church if he had brought his stock certificates. Church responded that he wanted to keep his shares of the company as "sweat equity." When Murphy said that he could not keep the shares, Church responded with "I don't know about that." Murphy told Church that the $5.00 per share he was offering employees was more than the stock was worth, to which Church responded with "that may or may not be true but we all worked so hard at Hybrid realizing the stock's potential." Church expressed his concern that Murphy would move the company to Alabama and sell it for more than he was offering Church at that time. When Murphy denied that this was his intention, Church replied that he had no way of knowing Murphy's plans. In order to assure Church that Murphy did not plan to sell the company, Murphy agreed to pay Church any difference in price if Hybrid stock were sold for more than $5.00 per share within the next year. Specifically, the "guarantee" stated as follows:
 
 
 13
 If stock is sold/purchased at higher than $5.00 a share you will receive difference up until Jan. 1st 1991.
 
 
 14
 Murphy wrote this guarantee on a piece of paper, which he handed to Church and said "Will this make you happy?" Church accepted and signed over his 300 shares to Hybrid in exchange for a check for $1500. It is undisputed that Murphy offered this guarantee and that Church accepted Murphy's offer, and there is no evidence of coercion, fraud or duress in providing the guarantees. There was no discussion at the meeting regarding the "equity value" of the shares or the meaning of the term.
 
 
 15
 On March 30, 1990, Murphy had a similar meeting with Barnes regarding deferred compensation, vacation and sick leave pay. Barnes requested, and Murphy wrote out and signed, a guarantee substantially similar to the one Murphy signed for Church. Barnes then sold his 700 shares of stock back to Hybrid for $5.00 per share. Again, no discussion of the term "equity value" took place at this meeting.
 
 
 16
 During the twelve month period covered by the guarantees, Hybrid entered into transactions with Recognition Equipment Incorporated ("R.E.I") on April 30, 1990, and with GES.FIN GESTIONI FINANZIARIE S.P.A. ("GES.FIN") in July of 1990 involving the transfer of shares of its stock. Upon demand, Hybrid and Murphy refused to pay Barnes and Church the difference in price above $5.00 per share sold, and Barnes and Church sued.
 
 
 17
 At the summary judgment hearing prior to trial, the district court entered an order specifying that the guarantees constituted valid contractual obligations. That order left for the jury the interpretation of the guarantees and the questions of their applicability to the stock transactions.
 
 
 18
 The jury determined that during the course of the guarantee period there were sales of Hybrid stock to R.E.I. and GES.FIN, and that the amount paid for the stock was $300 per share. The jury found that these sales triggered the amounts due on the guarantees to Barnes and Church and awarded them $295 per share in damages.
 
 
 19
 After the trial, the district court judge, by agreement of the parties, determined prejudgment interest, and awarded Barnes and Church prejudgment interest at 6% for a period of 14 months. Although the jury had found that the first stock sale occurred on April 30, 1990, when Hybrid first transferred stock to R.E.I., the district court nonetheless determined that prejudgment interest should not start accruing until Hybrid had received the cash from a later sale of stock to R.E.I in September of 1991, which was the first sale to generate sufficient funds for payment on the guarantees. These cross-appeals ensued.
 
 II.
 A.
 
 20
 Summary judgment is appropriate in those cases where there is no genuine dispute as to a material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The court's function at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). We therefore must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 477 U.S. 574, 587-88 (1986).
 
 
 21
 Nevertheless, the party opposing summary judgment must satisfy the burden of proof by offering more than a mere"scintilla" of evidence, and must produce evidence sufficient for a reasonable jury to find in her favor. Anderson, 477 U.S. at 252. Summary judgment is thus appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, id. at 248-49, such as where the non-moving party has failed to make a sufficient showing on an essential element of the case that the non-moving party has the burden to prove. Celotex v. Catrett, 477 U.S. 317, 322 (1986). Bearing this in mind, we examine the case before us.
 
 B.
 
 22
 On appeal, Hybrid and Murphy, citing Berger v. Burkoff, 200 Md. 561, 92 A.2d 376 (1952), argue that a new promise made by one party to a contract to induce the other party to perform its existing legal obligations under that contract is void for lack of consideration.[2] This argument is based on their view that the stock repurchase agreements created a preexisting legal duty for Barnes and Church to sell their shares back to Hybrid for "equity value" upon the termination of their employment. Undermining this argument, however, is the fact that nowhere was the term "equity value" defined nor was an explanation made of the calculation through which Murphy set this "equity value" at $5.00 per share. Murphy simply offered all departing employees $5.00 per share, an offer which Barnes and Church each rejected and renegotiated for a price based on a market value to be determined at a future date. Thus, Murphy's negotiations with Barnes and with Church should not be seen as a renegotiation of the stock repurchase agreements as a whole, but rather as negotiations over the "equity value" that could be ascribed to each share being repurchased. Barnes and Church were suspicious of Murphy's claim of Hybrid's insolvency, and doubted the $5 figure Murphy offered. Through these negotiations, the two sides agreed essentially to take the $5 figure as the true equity value of each share, rather than putting Murphy to his proof. They also agreed, however, that any stock transactions before January 1, 1991, would reflect an actual market valuation of the equity value of the stock close enough to the actual current value to be used as its proxy, and that such figure would replace the $5 figure Murphy established as the true value of the stock being repurchased.
 
 
 23
 Barnes and Church argue that a contract based on a compromise of a question of disputed liability for failure to perform a prior contract is valid consideration for the new contract. Eno Cotton Mills v. Mudge, 139 Md. 302, 115 A. 47 (1921). Because neither side knew what the "equity value" of the shares truly was or whether there was an enforceable legal requirement to sell back the shares, the parties compromised. This compromise constituted a newly bargained for agreement and made inquiry into the facts of the earlier repurchase agreements irrelevant and unnecessary. As the Maryland Court of Appeals in Hercules Powder Co. v. Harry T. Campbell Sons Co., 156 Md. 346, 144 A. 510 (1929) has stated:
 
 
 24
 [T]here is upon principle no reason why parties to an executory contract, who ... differ as to its meaning, may not change the agreement by mutual consent so as to make it conform ... to the agreement reached as a compromise of their differences arising out of the original contract ... [A] compromise of the differences between the parties, and the mutual agreement to rescind the old contract and enter into a new contract embodying the compromise, are sufficient consideration to support the new contract.
 
 
 25
 156 Md. at 362, 144 A. at 516.
 
 
 26
 As consideration for the newly bargained for price, Barnes and Church gave up their stock, whether or not they had an obligation to do so, in exchange for $5.00 per share and the promise of the difference in price per share if the stock sold for more within the next year. It is possible that $5.00 represented less than the"equity value" owing to Barnes and Church given that the meaning of "equity value" had never been defined. As consideration for the new agreement, however, Barnes and Church gave up their rights to claim a larger sum unless Hybrid stock sold for a higher price during the next year.
 
 
 27
 Furthermore, the parties' settlement of the issues over deferred compensation and vacation pay constituted additional consideration for the overall compromise of the issues outstanding between the employer and the departing employees. See Shimp v. Shimp, 287 Md. 372, 385, 412 A.2d 1228, 1234 (1980) (A benefit to the promisor or a detriment to the promisee is sufficient valuable consideration to support a contract). We therefore affirm the district court's determination that the guarantee agreements were valid and binding as a matter of law.
 
 III.
 
 28
 With respect to the cross-appeal regarding the calculation of prejudgment interest, Church and Barnes argue that the interest should accrue from the time the guarantee was triggered by the price setting sales transaction, which occurred when Hybrid first transferred stock to R.E.I for $300 per share on April 30, 1990. The district court disagreed and ordered accrual from the time that Murphy and Hybrid received sufficient funds from which to make payment on the guarantees. The district court found that the only transaction that generated sufficient funds for payment on the guarantees was the third in the series of stock transfers, which occurred after the guarantee period, so that interest should accrue from early September of 1991 to the date of judgment, a total of 14 months.
 
 
 29
 Both parties point to the principle that prejudgment interest is recoverable as a matter of right where the money claimed has actually been used by the other party. Travel Committee, Inc. v. Pan American World Airways, Inc., 91 Md.App. 123, 188, 603 A.2d 1301, 1333 (1992); I. W. Berman Properties v. Porter Bros. Inc, 276 Md. 1, 17, 344 A.2d 65, 75 (1965). Barnes and Church contend that Hybrid and Murphy were using money owed to them as of the first sale of stock, whereas Hybrid and Murphy argue that only the third sale generated enough revenue-producing income to constitute money owed to Barnes and Church. We agree with Barnes and Church.
 
 
 30
 I. W. Berman Properties holds that interest"is recoverable as a matter of right under contracts in writing to pay money on a day certain." 276 Md. at 16, 344 A.2d at 75.
 
 
 31
 "If the contractual obligation be unilateral and is to pay a liquidated sum of money at a certain time, interest is almost universally allowed from the time when its payment was due."
 
 
 32
 276 Md. at 18, 344 A.2d at 75 (quoting Affiliated Distillers Brands Corp. v. R.W.L. Wine & Liquor Co., Inc., 213 Md. 509, 516-17, 132 A.2d 582, 586 (1957) (internal citations omitted)). We find that Barnes and Church were actually due the $295 per share when Hybrid first transferred stock to R.E.I. on April 30, 1990, as determined by the jury, and that this date is the time from which prejudgment interest should be measured. Accordingly, we remand the case to the district court with instructions to modify its prejudgment interest ruling and award 30 months rather than 14 months of prejudgment interest.
 
 
 33
 AFFIRMED IN PART, MODIFIED IN PART, AND REMANDED.
 
 
 
 [1]
 Hybrid, a Delaware corporation, is no longer in business
 
 
 [2]
 The case of Berger v. Burkoff is distinguishable from the facts at hand. There, the parties entered into a written real estate contract containing the following integration clause:
 This Contract contains the final and entire Agreement between the parties hereto, and neither they nor their Agents shall be bound by any terms, conditions or representations not herein written.
 Berger, 200 Md. at 563, 92 A.2d at 377. The Maryland Court of Appeals, noting that real estate contracts are governed by the Statute of Frauds, rejected the seller's oral warranty that the basement was waterproof because no such warranty was written into the original contract. 200 Md. at 567, 92 A.2d at 379.